# 15-1089-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

RONALD HERRON, AKA Ra, AKA Ra Diggs, AKA Ra Digga, AKA Raheem,

*Defendant-Appellant,*

*and*

TYRONE WILLIAMS, AKA Biscuit, AKA Young Bricky, JOSEPH GARCIA, AKA Jo Jo, MUSA MARSHALL, AKA Slim, CRYSTAL LEWIS, AKA Ebb, VERDREEA OLMSTEAD, AKA Auntie, JOSEPH RANDOLPH, AKA Rizzle, JOSEPH VALENTIN, AKA J, TYHE WALKER, AKA G.I.B., AKA Guy in the Bushes, ALGENIS CARABELLO, AKA High-Henny, JORGE MEJIA, AKA Moose, AKA Mussolini, SHONDELL WALKER, AKA M-Dot,

*Defendants.*

_____

*On Appeal from the United States District Court*
*for the Eastern District of New York (Brooklyn)*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

LAW OFFICE OF
   KELLEY J. SHARKEY, ESQ.
*Attorneys for Defendant-Appellant*
26 Court Street, Suite 2805
Brooklyn, New York 11242
718-858-8843

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

QUESTIONS PRESENTED....................................................................................2

STATEMENT OF THE CASE................................................................................3

STATEMENT OF FACTS ......................................................................................4

    Introduction ....................................................................................................4

    Initial racketeering period and the killing of Frederick Brooks.........................6

    Herron's incarceration and the killing of Richard Russo ................................13

    Killing of Victor Zapata and Herron's arrest ................................................17

    The defense case ..........................................................................................25

    Government summation ................................................................................29

    Verdict and Sentence....................................................................................29

ARGUMENT .......................................................................................................30

    Point I

    HERRON WAS DENIED THE RIGHT TO A FAIR TRIAL
        WHEN THE COURT GRANTED HIS WITNESSESS
        THE PRIVILEGE NOT TO TESTIFY WITHOUT
        INQUIRING WHETHER THEIR TESTIMONY
        WOULD HAVE BEEN SELF-INCRIMINATING ...................................30

        Harmless Error Analysis ...........................................................................39

Point II

THE COURT ERRED WHEN IT ALLOWED THE
GOVERNMENT TO DISPLAY HERRON'S RAP
MUSIC VIDEOS, WHICH WERE INFLAMATORY,
PREJUDICIAL, AND UNNECESSARY TO THE
GOVERNMENT'S CASE ........................................................................43

Point III

CELL-SITE RECORDS SHOULD HAVE BEEN SUPPRESSED
WHEN THERE WAS NO PROBABLE CAUSE FOR
THE ORDER UPON WHICH THEY WERE ISSUED,
AND THE GOOD FAITH EXCEPTION DID NOT APPLY. .................54

Point IV

THIS COURT SHOULD VACATE AND DISMISS
COUNTS 7, 10, 14, AND 19 BECAUSE THE
CHARGES UNDERLYING THE VIOLATIONS
ARE NOT "CRIMES OF VIOLENCE." ....................................................63

    I.    The "residual clause" of § 924(c)(3)(B) is
         unconstitutionally vague ....................................................64

    II.   The charges that underlie counts 7, 10, 14, and 19
         (murder in-aid-of racketeering, drug-related murder,
         and Hobbs Act robbery) do not satisfy the force
         clause. .................................................................................67

CONCLUSION ..........................................................................................71

CERTIFICATE OF COMPLIANCE ........................................................72

# TABLE OF AUTHORITIES

**Page**

**Cases**

Cameron v. City of New York,
    598 F.3d 50 (2d Cir. 2010)..................................................................53

Chapman v. California,
    87 S.Ct. 824, 386 U.S. 18 (1967)..............................................39, 62

Chrzanoski v. Ashcroft,
    327 F.3d 188 (2d Cir. 2003)..............................................................69

Commonwealth v. Augustine,
    467 Mass. 230, 4 N.E.3d 846 (Mass. 2014)......................................57

Dimaya v. Lynch,
    803 F.3d 1110 (9th Cir. 2015)............................................................66

Fahy v. Connecticut,
    375 U.S. 85 (1963).............................................................................62

Franks v. Delaware,
    98 S.Ct. 2674, 438 U.S. 154 (1978)......................................54, 59, 61

Garner v. United States,
    96 S.Ct. 1178 (1976).........................................................................31

Hoffman v. United States,
    71 S.Ct. 814 (1951)...........................................................................31

In re United States for Historical Cell Site Data,
    724 F.3d 600 (5th Cir. 2013).............................................................58

James v. United States,
    550 U.S. 192.......................................................................................66

Johnson v. United States,
    __ U.S. __, 135 S.Ct. 2551 (2015)...........................................*passim*

Johnson v. United States,
    559 U.S. 133 (2010) ......................................................................................68

Klein v. Harris,
    667 F.2d 274 (2d Cir. 1981)...........................................................................37

McKaskle v. Wiggins,
    104 S.Ct. 944 (1984) ......................................................................................39

Neder v. United States,
    119 S.Ct. 1827 (1999) ....................................................................................39

Old Chief v. United States,
    519 U.S. 172 (1997)........................................................................................49

Piemonte v. United States,
    81 S.Ct. 1720 (1961) ......................................................................................37

Rogers v. United States,
    340 U.S. 367 (1951) .......................................................................................30

Snyder v. Phelps,
    131 S. Ct. 1207 (2011) ...................................................................................52

State v. Skinner,
    218 N.J. 496, 95 A.3d 236 (2014)..................................................................52

Street v. New York,
    394 U.S. 576 (1969) .......................................................................................52

United States v. Acosta,
    470 F.3d 132 (2d Cir. 2006)...........................................................................68

United States v. Al- Moayad,
    545 F.3d 139 (2d Cir. 2008)...........................................................................48

United States v. Apfelbaum,
    445 U.S. 115 (1980) .......................................................................................30

United States v. Arias,
    404 Fed.Appx. 554 (2d Cir. 2001) .................................................................40

United States v. Avila,
    770 F.3d 1100 (4th Cir. 2014)..........................................................65

United States v. Awadallah,
    436 F.3d 125 (2d Cir.2006)...........................................................46

United States v. Birney,
    686 F.2d 102 (2d Cir.1982)...........................................................46

United States v. Bowe,
    698 F.2d 560 (2d Cir 1983)...........................................................37

United States v. Campino,
    890 F.2d 588 (2d Cir.1989)...........................................................61

United States v. Cimino
    2016 WL 386061 (2d Cir. 2016)......................................................36

United States v. Curley,
    639 F.3d 50 (2d Cir. 2011)...........................................................44

United States v. Davis,
    785 F.3d 498 (11th Cir.2015) (en banc) ..........................................58

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001)..........................................................43

United States v. Doe,
    478 F.2d 194 (1st Cir.1973) .........................................................37

United States v. Figueroa,
    618 F.2d 934 (2d Cir. 1980)......................................................45, 46

United States v. Foster,
    939 F.2d 445 (7th Cir. 1991).........................................................53

United States v. Fulminante,
    111 S.Ct. 1246 (1991) ...............................................................39

United States v. Gallo,
    859 F.2d 1078 (2d Cir. 1988)........................................................39

United States v. Gamez,
    577 F.3d 394 (2d Cir. 2009)..............................................................................70

United States v. Gonzalez,
    2000 WL 1844762 (S.D.N.Y. 2000)................................................................38

United States v. Gonzalez- Longeria,
    2016 WL 537612 (5th Cir. 2016)......................................................................66

United States v. Graham,
    796 F.3d 332 (4th Cir. 2015).....................................................................56, 58

United States v. Ivezaj,
    568 F.3d 88 (2d Cir.2009)................................................................................55

United States v. Jones,
    132 S.Ct. 945 (2012) .......................................................................................57

United States v. Leon,
    468 U.S. 897 (1984) ........................................................................................59

United States v. Livoti,
    196 F.3d 322 (2d Cir. 1999)...............................................................47, 48, 49

United States v. Lumpkin,
    192 F.3d 289 (2d Cir. 1999)............................................................................36

United States v. Mack
    2014 WL 6085306 (D. Conn. 2014) ...............................................................59

United States v. Maynard,
    615 F.3d 544 (D.C. Circuit 2010) .............................................................56, 57

United States v. McCallum,
    584 F.3d 471 (2d Cir. 2011)...............................................................49, 50, 53

United States v. McCullough,
    523 Fed.Appx. 82 (2d Cir. 2013) ....................................................................59

United States v. Paulino,
    445 F.3d 211 (2d Cir. 2006).............................................................................47

<u>United States</u> v. <u>Pierce</u>,
   785 F.3d 832 (2d Cir. 2015)........................................................................52, 53

<u>United States</u> v. <u>Pitre</u>,
   960 F.2d 1112 (2d Cir. 1992).........................................................................48

<u>United States</u> v. <u>Reilly</u>,
   76 F.3d 1271 (2d Cir. 1996)............................................................................60

<u>United States</u> v. <u>Rodriguez</u>,
   706 F.2d 31 (2d Cir.1983)........................................................................32, 36

<u>United States</u> v. <u>Salameh</u>,
   152 F.3d 88 (2d Cir.1998).............................................................................46

<u>United States</u> v. <u>Steppello</u>,
   733 F.Supp.2d 347 (N.D.N.Y. 2010), <u>rev'd on other grounds</u>,
   664 F.3d 359 (2d Cir. 2011).........................................................................61

<u>United States</u> v. <u>Stuckey</u>,
   253 F. Appx 468 (6th Cir. 2007).....................................................................53

<u>United States</u> v. <u>Torres-Miguel</u>,
   701 F.3d 165 (4th Cir. 2012)...........................................................................68

<u>United States</u> v. <u>Tutino</u>,
   883 F.2d 1125 (2d Cir. 1989)..........................................................................37

<u>United States</u> v. <u>Vilar</u>,
   729 F.3d 62 (2d Cir. 2013)............................................................................70

<u>United States</u> v. <u>Vivas-Ceja</u>,
   ___ F.3d ___, 2015 WL 9301373 (7th Cir. 2015) ...........................................66

<u>United States</u> v. <u>Williams</u>,
   205 F.3d 23 (2d Cir. 2000)............................................................................48

<u>United States</u> v. <u>Wilson</u>,
   493 F.Supp. 2d 484 (E.D.N.Y. 2006) .............................................................53

United States v. Zappola,
  646 F.2d 48 (2d Cir. 1981)...............................................30, 31, 35, 36

Waller v. Georgia,
  133 S.Ct. 2276 (1984) .........................................................39, 65, 68

**Statutes**

18 U.S.C. § 16(b) .....................................................................66, 67

18 U.S.C. § 922(g)(1)....................................................................2

18 U.S.C. § 924(a)(2)....................................................................2

18 U.S.C. § 924(c) .................................................................*passim*

18 U.S.C. § 924(c)(1)(A)(i) ...........................................................1

18 U.S.C. § 924(c)(1)(A)(ii) .......................................................1, 2

18 U.S.C. § 924(c)(1)(C)(i) ...........................................................1

18 U.S.C. § 924(c)(3).................................................................63

18 U.S.C. § 924(c)(3)(A) .........................................................63, 67

18 U.S.C. § 924(c)(3)(B) .......................................................*passim*

18 U.S.C. § 924(c)(A) .................................................................70

18 U.S.C. § 924(e)(i) ..................................................................68

18 U.S.C. § 924(j)(1) ...............................................................1, 2

18 U.S.C. § 924e(2)(B)(ii) ...........................................................64

18 U.S.C. § 1951(a) ....................................................................1

18 U.S.C. § 1951(b)(1)............................................................67, 69

18 U.S.C. § 1959(a)(1)............................................................1, 2

18 U.S.C. § 1959(a)(5) ............................................................2

18 U.S.C. § 1961(1) ...............................................................1

18 U.S.C. § 1961(5) ...............................................................1

18 U.S.C. § 1962(c) ...............................................................1

18 U.S.C. § 2703(c) ..............................................................59

18 U.S.C. § 2703(c)(l) ......................................................55, 56

18 U.S.C. § 2703(d) .........................................................55, 56

18 U.S.C. § 3231 ...................................................................2

21 U.S.C. § 841(a)(1) .............................................................1

21 U.S.C. § 841(b)(1)(C) ........................................................1

21 U.S.C. § 846 .....................................................................1

21 U.S.C. § 848(e)(1)(A) ....................................................1, 2

28 U.S.C. § 1291 ...................................................................2

State Penal Law § 125.25 (1) ...........................................67, 68

**Rules**

F.R.E. Rule 403 ...........................................................49, 50, 51

F.R.E. Rule 404.21 ...............................................................49

**Other Authorities**

1 Charles T. McCormick et al., McCormick on Evidence
    § 123 (John William Strong ed., 4th ed. 1992)................................................31

Weinstein's Federal Evidence § 403.04 [1] ...........................................................46

## PRELIMINARY STATEMENT

Defendant-appellant Ronald Herron appeals from a judgment of the United States District Court for the Eastern District of New York (Garaufis, J.) convicting him upon a June 26, 2014 jury verdict of the following 21 counts of criminal activity:

1)   Racketeering (18 U.S.C. §§1961(1) and (5));

2)   Racketeering conspiracy (18 U.S.C. §1962 (c);

3)   Conspiracy to distribute cocaine base (21 U.S.C. §841(a)(1));

4)   Unlawful use and possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. §924(c)(1)(A)(i);

5)   Murder in-aid-of racketeering (Brooks) (18 U.S.C. §1959(a)(1));

6)   Drug-related murder (Brooks) (21 U.S.C. §848(e)(1)(A));

7)   Unlawful use and discharge of a firearm in furtherance of a crime of violence (18 U.S.C. §§924(c)(1)(A)(ii) and (c)(1)(c)(i));

8)   Causing death through use of firearm (Brooks) (18 U.S.C. § 924(j)(1));

9)   Robbery of narcotics and narcotics proceeds (18 U.S.C. § 1951(a));

10)  Unlawful use and brandishing of a firearm in furtherance of a crime of violence (18 U.S.C. §§ 924 (c)(1)(A)(ii), 924(c)(1)(C)(i));

11)  Conspiracy to distribute heroin (21 U.S.C. §846, §841(a)(1) and (b)(1)(C));

12)  Murder in-aid-of racketeering (Russo) (18 U.S.C. §1959(a)(1));

13) Drug-related murder (Russo) (21 U.S.C. §848(e)(1)(A));

14) Unlawful use and discharge of a firearm in furtherance of a crime of violence (18 U.S.C. §§924(c)(1)(A)(ii) and (c)(1)(c)(i));

15) Causing death through use of firearm (Russo) (18 U.S.C. § 924(j)(1));

16) Conspiracy to murder in-aid-of racketeering (Zapata) 18 U.S.C. §1959(a)(5));

17) Murder in-aid-of racketeering (Zapata) (18 U.S.C. §1959(a)(1));

18) Drug-related murder (Zapata) (21 U.S.C. §848(e)(1)(A));

19) Unlawful use and discharge of a firearm in furtherance of a crime of violence (18 U.S.C. §§924(c)(1)(A)(ii) and (c)(1)(c)(i));

20) Causing death through use of firearm (Zapata) (18 U.S.C. § 924(j)(1));

21) Felon in possession of firearm (18 U.S.C. §§ 922(g)(1) and 924(a)(2)).

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction in the District Court was based on 18 U.S.C. §3231. This Court has jurisdiction pursuant to 28 U.S.C. §1291. This is an appeal from a final judgment entered on April 2, 2015. Herron filed a timely notice of appeal. (A. 357).

## QUESTIONS PRESENTED

1. Whether Herron was denied the right to a fair trial when the court granted his witnesses the privilege not to testify without inquiring whether their testimony would have been self-incriminating.

2.      Whether the court erred when it allowed the Government to display Herron's rap music videos, which were inflammatory, prejudicial, and unnecessary to the Government's case.

3.      Whether cell-site records should have been suppressed when there was no probable cause for the Order upon which they were issued and the good faith exception did not apply.

4.      Whether this Court should vacate and dismiss counts 7, 10, 14, and 19 because the charges underlying the violations are not "crimes of violence."


STATEMENT OF THE CASE

Appellant Ronald Herron ("Herron") was charged in a superseding indictment with a pattern of racketeering activity that spanned the period of January of 1988 through October of 2010, and which involved cocaine and heroin distribution, murder, and robbery. The 21-count indictment included three murder charges, narcotics trafficking, robbery, and associated firearms charges. Herron was tried before Judge Nicholas G. Garaufis and a jury, in the Eastern District of New York. He was convicted on all counts in the indictment after a five-week trial, on June 26, 2014. On April 2, 2015, Herron was sentenced to 12 life terms plus 105 consecutive years.

<u>STATEMENT OF FACTS</u>

Introduction

Herron was charged with racketeering activity that began in January of 1998, when he was 16 years old[1], and continued until his arrest in October of 2010. (A. 310-335). Herron was incarcerated for more than half of that timeframe – a 15-month period from 1999 to 2001, followed by the 6-year span of 2001 to 2007.

The indictment attributed seven racketeering acts to the "Ronald Herron Enterprise." Herron was charged with a conspiracy to possess and distribute cocaine, spanning the entire 11 ½ - year period. The other racketeering acts included three homicides - that of Frederick Brooks, Richard Russo, and Victor Zapata - the robbery of Joseph Garcia, and the attempted murder of Kendall Robinson (counts 1 and 2). The remaining substantive counts of the indictment included the conspiracy to distribute cocaine and the use of firearms during the entire enterprise period (counts 3 and 4); as to Brooks, murder in-aid-of racketeering, drug-related murder, and firearms counts (counts 5 through 8); robbery of narcotics from Joseph Garcia and related firearms use (counts 9 and 10); conspiracy to distribute heroin in 2008 (count 11); as to Russo, murder in-aid-of racketeering, drug-related murder, and related firearms counts (counts 12 through 16); as to Zapata, conspiracy to murder and murder in-aid-of racketeering,

---

[1] Ronald Herron was born on March 30, 1982. (PSR. 4 ). Numbers preceded by "PSR." refer to the pre-sentence report, which has been sent to this Court under separate cover.

drug-related murder, and related firearms counts (counts 17 through 20); and felon in possession of a firearm (count 21).

Herron was arrested on October 5, 2010 pursuant to an arrest warrant, arising from an October 1, 2010 indictment that charged him with three counts of narcotics distribution and firearms possession and use, during the period of January of 2006 to July of 2010. In November of 2010, the Government filed a superseding indictment (S-2) that charged four counts of narcotics distribution and firearms possession spanning the same time period, and which charged eleven defendants in addition to Herron. (A. 74-81). On February 13, 2012, the Government filed S-6, a 23-count indictment that charged Herron alone with heading the Ronald Herron enterprise, committing three murders, and other crimes. (A. 82-110). All of the defendants on the earlier indictment resolved the charges against them before Herron came to trial; four of them testified as Government witnesses against Herron, and one testified as a defense witness.

Prior to trial, Herron moved to suppress evidence concerning historical cell-site information. The motion was denied.

The Government's case was proved through the testimony of over sixty witnesses, nine of whom testified under cooperation agreements or had received immunity. The trial took place over a 5-week period. The Government played six of Herron's rap and promotional videos, spoke about them in its opening

statement, quoted their language throughout the trial, and played excerpts of them on summation. As to the defense case, Herron was precluded from calling two fact witnesses after the court allowed them to invoke the Fifth Amendment privilege as to their entire testimony, without having conducted any preliminary inquiry as to the basis on which their testimony could be deemed self-incriminatory. Herron called three witnesses who testified about the rap music business and Herron's role in it. In addition, Herron testified and called several other witnesses who contradicted or clarified statements made by the Government's witnesses.

Herron was found guilty of every count in the indictment. (A. 342-348). He was sentenced to 12 life terms and a consecutive term of 105 years. (A. 349-356).

Initial racketeering period and the killing of Frederick Brooks

Former New York City Police Department (hereafter "NYPD") Detective FAZZINGO testified that, on June 18, 1998, he was on patrol when he noticed a young man who was walking. After making eye contact, the man turned and ran away, tossing an object. Fazzingo found a .38 revolver on the ground. (T. 1398-1401)[2]. The Department did not test the gun for fingerprints, nor did it try to establish the gun's ownership. (T. 1412). On July 23, 1998, Fazzingo executed a search warrant at 423 Baltic Avenue, recovering several firearms and empty ziplock bags. (T. 1403-1406, 1407). He arrested Herron, who was in the

---

[2] Numbers preceded by "T." refer to the trial transcript.

apartment. (T. 1409). Even though his very brief encounter with the man who tossed the gun had occurred over one month before, Fazzingo remembered that Herron was the man he had seen earlier. (T. 1411). On July 28, 1998, Herron pled guilty to the class A misdemeanor of fourth-degree criminal possession of a firearm in connection with the arrest. (T. 1426- 1427).

LAWRENCE WALSH, a retired NYPD officer, testified that on June 16, 2001, he observed Brooks' deceased body in the lobby at 198 Bond Street in Brooklyn. He did not recover fingerprints or DNA samples from the scene. Herron objected to the admission of two "extremely gruesome" photographs of Brooks' body that were taken directly after the shooting. The court admitted the photographs, even though the Government agreed they were "gruesome" and the court noted they depicted a large amount of blood and were "graphic." (T. 679, 681, 880). The Government also introduced a shell casing that had been discharged from a .38 caliber firearm. (T. 690 – 709).

MARK BASOA, former NYPD officer, was deemed an expert in firearms and ballistics examination comparison. In connection with the Brooks homicide, he examined 4 shell casings and determined they came from the same gun (T. 812), however the weapon that ejected the casings was never found. He also examined bullets and bullet fragments from the scene, but could not determine if they had come from the same gun. (T. 803- 823). CHARLES CATANESE, a

former New York City medical examiner, testified that Brooks was killed by 4 gunshots. (T. 1155). Stippling was present, which was consistent with the gun being fired at a 10-inch range. (T. 1161).

The civilian witnesses on the Brooks' homicide were Darnell Saunders, who was testifying under a grant of immunity, his girlfriend Amber Hudson, Linda Pack, and Sequan Wallace, a cooperating witness. DARNELL SAUNDERS stated that he was in federal custody serving a sentence for crack/cocaine possession, and that he was granted immunity from prosecution for drug trafficking. In 1998, he started selling crack in the lobby of 198 Bond Street; at the time of Brooks' killing, he was serving a 5-year probationary sentence from a drug conviction and was still selling drugs, working on his own. He grew up with Herron, and testified that Herron was selling drugs at 423 Baltic. (T. 712- 729, 740, 763).

Saunders said he was in front of 198 Bond Street on June 16, 2001, sitting in a truck with Amber Hudson. He claimed that Herron and Brooks were arguing about Brooks' selling drugs in that building, and he went over to them to "defuse the situation." (T. 730). Saunders testified that he had met Brooks a couple of months before (T. 745), but acknowledged a prior statement in which he said he had met Brooks two or three days before. (T. 747, 798). Saunders testified that the three of them went into the lobby, where Herron shot Brooks in the face. (T. 731). He saw Herron shoot the gun; Saunders ran out the backdoor after the shot was

fired. (T. 732, 775). Saunders admitted that in his prior testimony before a Kings County Grand Jury, approximately one month after the crime, he was asked, "When you started to run, what happened?" and answered, "I heard a shot." (T. 788, 791). Over defense objection, the Government was allowed to read a statement made by Saunders at the precinct, in which he said he ran after the shot was fired. (T. 792). The court admitted that statement "not for the truth" but only to show that the statement had been made and its timing. (T. 792).

Saunders testified that he promptly reported the incident to the police, he identified Herron from photos and a line-up, and testified in the Grand Jury. (T. 734, 735, 744, 736). During the subsequent State-level prosecution, Saunders said he had reported Herron because he wanted to clear his own name for the murder of Frederick Brooks. (T. 781-782). Saunders testified to receiving two phone calls from Herron in which Herron asked why he "told on" him. (T. 736). Saunders said he did not testify against Herron at the State trial because he was afraid. (T. 738).

AMBER HUDSON stated she met up with her boyfriend Saunders on June 16, 2001, at 198 Bond Street. Viewing everything from the curb where the truck was parked, she saw Herron and Brooks, who were "talking about Darnell . . . arguing." (T. 840). She echoed Saunders' statement that she heard him trying to "defuse" the argument (T. 840). From the truck, Hudson saw the three men enter

the building, and with a view through the window on the upper half of the door that led to the lobby, she saw Herron shoot Brooks. (T. 841, 852, 853).  Hudson reported the occurrence to the police, but stopped cooperating after hearing that threats had been made. (T. 841- 42).

KAREN BENNETT, a former Kings County Assistant District Attorney, said that, in October of 2002, she was in the D.A.'s office when she heard Saunders yelling, "I can't testify. I have family."  (T. 1185).  She said that Saunders had been brought to court as a material witness, and that he and Hudson did not testify at Herron's trial.  (T. 1180-1187).

LINDA PACK stated she was living at 198 Bond Street, on the 3rd floor, when Brooks was killed. (T. 886).  At the time of the incident, she heard Herron and Saunders arguing.  (T. 887, 892).  Pack came downstairs and was standing by the back staircase when she heard a shot and ran upstairs. (T. 889).  Pack saw Herron walk through the door and out to the street with a gun in his hand. (T. 889). She said both that Saunders exited through the front door, that she did not see Saunders leave the building, and, at another point, that she did not see him exit through the front. (T. 891, 903, 905, 907).  In any case, had he run out the back stairs, she would have seen him.  (T. 903).  Pack admitted a family connection with Saunders. (T. 893).  She said that, apart from the three men, there were also two women in the lobby at the time of the shooting. (T. 902-903).

SAQUAN WALLACE testified that he was in federal custody for murder, racketeering and drug trafficking, having pled guilty in 2008, and was serving a 30-year sentence. (T. 947, 994). In addition, he recently pled guilty to Hobbs Act conspiracy and to disposing of a murder weapon, and was awaiting sentence on that case. He faced a maximum of life imprisonment. (T. 948 – 950, 1035). Wallace admitted lying to federal marshals about his violent activities. (T. 1080-1082). He also admitted to making false, written statements on two occasions in reference to his murder conviction (T. 995), and filing appeals and motions based on allegations he knew were lies. (T. 999, 1120 - 1129). He entered into a cooperation agreement before pleading guilty in April of 2014, approximately five weeks before testifying in this case. (T. 1129- 1033, 1044).

Wallace testified that from 13 years of age he sold drugs and had a "lifestyle" of committing robberies too numerous to count. (T. 953, 990, 1032-1046). He and his brother were the most powerful drug crew in the Wyckoff Housing Development from approximately 1998 until his incarceration in 2006. (T. 960). He said that during much of the 2000's he "terrorized" the Wyckoff projects (T. 1068); he described murdering a local drug dealer (T. 982, 1071), beating and sodomizing with a broomstick a woman who had not paid him $600 of drug money (T. 981, 1064), and other numerous brutal acts including pistol-whippings, stabbings, attempted murders and assaults. (T. 1061, 1065- 1075).

Wallace said he met Herron in 2000 and never saw him again after Herron's arrest in June of 2001. (T. 1002, 1028, 1106). Herron was not involved in any of the brutal acts Wallace testified about. Furthermore, Herron's arrest in 2001 gave Wallace the "green light to - to terrorize Gowanus and brought more money to us." (T. 1032).

Wallace said that, in June of 2001, Herron suggested that Wallace kill a guy who was hustling in his building, and, in exchange, Herron would let Wallace sell drugs in one of the buildings he controlled. They did not discuss any particular plans of how this would happen or which building Wallace would get. (T. 1016, 1017). A couple of days later, Herron told Wallace he had "taken care of the situation" and needed a place to stay. (T. 1019). Wallace agreed that Herron could stay in 130 Third Ave, Apt. 7-C. He testified about the transfer of a .45 caliber and a .38 caliber gun between himself and Herron around the time of the killing. Speaking about one of the guns, Saunders explained that it was "in a circle," passed along and used by many different people, including himself. (T. 1015 - 1026).

DARRIEN QUASH, a retired NYPD detective, testified that he arrested Herron on July 12, 2001 at 130 Third Ave., Apt. 7-C while executing a search warrant that said various "individuals" were using the apartment to store guns and drugs. (T. 930). He recovered a .38 special handgun, ammunition, and crack

cocaine. He did not know if the weapon was ever checked for fingerprints. (T. 917-925). As a result of the arrest, Herron pled guilty to third-degree criminal possession of a controlled substance on November 26, 2002. (T. 1165). He was sentenced to 2 to 6 years in prison.

<u>Herron's incarceration and the killing of Richard Russo</u>

RANDY ZIMPFER, Lieutenant at the New York State Department of Corrections and Community Supervision, explained the rules pertaining to inmate correspondence in the state prison system, and provided examples of how those rules may be violated. The Government introduced examples of Herron's unauthorized correspondence and pointed out that it inferred Herron's involvement in gang activity. Zimpfer admitted that inmates sometimes affiliate with gangs because they believe doing so will serve the interests of self-protection. Herron's correspondence evidenced his connections with Stacey Knight, a leader of the Bloods, and several of the cooperators. (T. 1187- 1254).

NANCY COOPER, NYPD Sargent, testified that on May 9, 2008 she responded to call at 423 Baltic Street, where Richard Russo was found dead in the elevator in the building's lobby. (T. 1391- 92). Photographs taken at the morgue were admitted over defense counsel's objection that they were prejudicial and did not prove any contested facts. (T.1286, 1395). Dr. AGLAE CHARLOT, a medical examiner, testified that Russo was killed by gunshot wounds to the head, and that

the gun had been fired from six to eighteen inches away. (T. 1428 - 1443). ROBERT SAENZ, an NYPD detective who investigated the crime scene after Russo's homicide, stated no DNA evidence was found and no fingerprints were taken from the lobby. (T. 1639-1660). DETECTIVE JAMES VALENTI examined a shell casing and a bullet taken from the scene. (T. 2177). He stated they both originated from a .38 caliber firearm, that no fingerprints or DNA were taken from them, and explained why it was unlikely that such evidence could be retrieved from these ballistics. (T. 2178- 79).

Two civilian witnesses testified about the killing of Richard Russo: Joseph Garcia and Rafael Gonzalez, aka "Feo." JOSEPH GARCIA testified about his involvement in drug dealing and stated that he pled guilty to racketeering, narcotics trafficking and firearms charges. He faced a possible maximum life sentence and was testifying under a cooperation agreement. (T. 1339- 1342, 1346).

Garcia was in the lobby on the day Russo was killed, along with Russo, Thye Walker, Feo, and Herron, but he had gone upstairs just before the shooting took place and did not see it. (T. 1326- 1329, 1351, 1355). While he was in the lobby, he saw Herron and Walker go into a back staircase. Herron may have left the building at that point; Garcia knew only that when he went upstairs, only Feo and Russo were still in the lobby. (T. 1355, 1356).

Garcia testified to a conversation he had had with Feo a couple of weeks after Russo was killed. Feo said to him, "My bad. He had to go," referring to Russo. Russo had been a member of the Bloods. (T. 1331, 1357).

Garcia related that, in 2007, he was selling crack on his own at 423 Baltic Avenue when Herron and his friends robbed him. Several months later, he started selling drugs for Herron. (T. 1305-1307). Herron controlled the building, and others would not sell there because they were afraid of him. (T. 1313-14). Garcia testified that Herron was the leader of the Gowanus Projects Murderous Mad Dogs (hereafter, "MMD"), which was a section of the Bloods. (T. 1314). Garcia identified various people associated with Herron, explained their roles in the drug business, and whether they had any gang affiliations. (T. 1315- 1323).

Over defense counsel's objection, the Government played a video produced by Herron, "Project Music Video One, Part 1." (T. 1339, Ex. 1200). Garcia explained that Herron was the rapper "RA Diggs," and that this video was meant to depict normal activity in the neighborhood, to show that the life Herron was rapping about was authentic. He explained the film included unscripted video of a "crackhead" who was trying to buy drugs but did not have enough money. (T. 1334 – 1338).

RAFAEL GONZALEZ, aka "Feo" testified that he was in federal custody facing a maximum life sentence, having pled guilty to homicide, drug trafficking,

and other crimes. (T. 1445, 1516). He testified under a cooperation agreement. (T. 1518). Feo said he started selling drugs with Herron around 2000 - 2001. (T. 1451- 1453). He was arrested in July of 2001 for five undercover sales of crack cocaine and sentenced to a term of 2 to 6 years, of which he served the entire 6 years. (T. 1469, 1473- 74, 1527, 1599- 1603). Feo said he started selling drugs again with Herron upon his release in 2007, and he became a member of the MMD. (T. 1479- 1483).

Feo testified that he, Herron, and Russo were in the elevator when Herron shot and killed Russo. (T. 1488, 1497-98, 1586). Before that occurred, however, Russo had told Feo that if Herron ever confronted him, he would kill him. Feo said that as a result of that conversation, he talked with others, but not Herron, about shooting Russo a couple of times in order to get him to leave the building. He told Walker to get the gun, but Walker talked him out of doing it. (T. 1493, 1584- 1585). Feo testified, in addition, to a beef between Russo and Feo's brother in which Russo had pulled a gun on Feo's brother. (T. 1583).

Feo said that after Russo was shot, he wiped the elevator to get rid of fingerprints, and he told Herron to give him the gun. (T. 1499). They drove off together, and eventually handed the gun to Herron's friend. (T. 1500, 1502). Feo was arrested in connection with the killing shortly afterwards, but he was promptly released. (T. 1506). Thereafter, Feo generally stayed away from the Gowanus

projects as much as possible. (T. 1571, 1609). Over defense counsel's objection, Feo was allowed to testify that he stayed away because "the only thing he [Herron] want to do is kill people." (T. 1635).

Feo stated that when he was arrested in February 2011 by federal agents, he was once again a suspect in Russo's death. (T. 1624). It was at that point that Feo told law enforcement that Herron had killed Russo. (T. 1514). Feo admitted that he lied, in March of 2013, when a homemade shank was found in his cell and that he tried to pin it on someone else. (T.1629-1631). On re-direct, over numerous defense objections, the prosecutor asked about incidents in prison where the Bloods came at Feo, and Feo was permitted to testify that he needed the shank to protect himself in prison from Herron and the Bloods. (T. 1635- 1637).

Killing of Victor Zapata and Herron's arrest

WILLIAM BROWN, NYPD Detective, said that on September 27, 2009, he learned that Victor Zapata had been killed by multiple gunshots outside the Wyckoff Housing Project. (T. 2222). He recovered spent cartridges and requested ballistics analysis and fingerprints regarding them. (T. 2239- 2247). DETECTIVE JAMES VALENTI testified that the shell casings recovered from the scene and the bullets from the morgue were all consistent with having been shot from a .40 caliber firearm. (T. 2185- 2191).

DETECTIVE LOUIS YERO of the NYPD testified that there were surveillance videos of the lobby and courtyard of 185 Nevins Street from the time and date of Zapata's killing. (T. 2499). A video was played, and Yero identified a man who was seen standing in front of 185 Nevins Street and then walking away as Zapata. (T. 2515-16). In a later part of the video clip, he pointed to a man coming out of 185 Nevins wearing a black hoodie and attacking Zapata. (T. 2517). Yero testified that none of the ballistics evidence recovered from Zapata's killing was ever connected to Herron. (T. 2530).

Dr. FLORIANA PERSECHINO, a medical examiner, said she performed an autopsy of Zapata. She stated that four of Zapata's gunshot wounds were from the back, and there was a head wound from the front or side. None of the shots were at close range. (T. 2455 - 2478). Defense counsel objected to the admission of six "disturbing" autopsy photographs of Zapata's body as prejudicial and unnecessary, pointing out that the medical examiner could instead use the reports and diagrams to demonstrate Zapata's wounds. Stating that the photos were no more prejudicial than those of Brooks' deceased body taken in the vestibule, the court ruled them admissible. (T. 2446).

VINCENT WINFIELD stated that he was in federal custody, having been convicted of racketeering, drug trafficking, attempted murder, and other crimes. (T. 1767, 1960). He explained that he was facing a life sentence, was testifying

under a cooperation agreement, and that, at one point, he had lied to the Probation Department about his gang membership because, "I wanted to get a more lenient sentence." (T. 1961, 1986-87). Winfield testified that he committed the crimes to which he pled guilty for Herron, who was his boss in the narcotics business and in the Bloods, and who had brought him into the MMD. (T. 1768, 1772). Winfield became Herron's bodyguard, carrying a weapon to protect him. (T. 1814).

Winfield testified about his history of criminal activity, starting with when he began selling crack at thirteen years of age. (T. 1970). Around September of 2008, Herron and Mejia told those selling drugs in Gowanus that they had to work for Herron. Winfield said the drug sellers largely complied, because Herron had, "beat a body . . . [m]eaning he got charged with a murder and he beat it, so he was like untouchable." (T. 1816 - 1819). Afterwards, Herron expanded his control to the Wyckoff Projects. He told Winfield and others that if they saw any outsiders selling drugs, they should rob them the first time and shoot them the second time. (T. 1826-27). Winfield identified photos of many individuals who sold drugs for Herron, and discussed whether they were members of the Bloods or MMD. (T. 1844-49).

Winfield stated that Herron contacted him when Mejia was shot, and they visited Mejia in the hospital. (T. 1894). Mejia had told Herron that Victor Zapata, aka "Macho," had shot Mejia, and that Zapata and "Manny" had told Crystal

Lewis, who sold drugs for Herron, that she could not sell drugs in Wyckoff any more. (T. 1898- 99, 1919). Winfield said he and Herron went looking for Macho and Manny in order to kill them, and that Lewis texted them messages that related Manny and Macho's whereabouts. (T. 1901-1904). Over defense counsel's objection, Winfield testified about a conversation he had had with Herron about Winfield's shooting of Jarel, in which Herron instructed him on how to shoot a person who is on the run. (T. 2056 - 57). Winfield was arrested with a .22 caliber firearm while driving around with Herron looking for Manny and Macho. (T. 1903, 1912, 2024-25).

Winfield testified that he often filmed Herron in order to help promote Herron's music. (T. 1913-14, 1947-48). He said Herron was serious and ambitious about becoming a genuine rap star, and the videos were made for commercial exposure. (T. 2016).

The Government played five videos that Herron had produced, and the jury received transcripts of their audio content. [3] (Exhibits 1201 and 1200). Winfield was asked to explain various scenes in the videos. He said part of one video was filmed in the hospital when he and Herron visited Mejia. In the video, Herron said, "going to see you soon at a cemetery near you"; Winfield said Herron was

---

[3] Those videos were "Live By the Gun, Die By the Gun," "Slow Down Remix," "Man Down Tycoon," "Project Music One (Part Two)," and "Project Music Three." They are discussed further in Point II of the Argument.

referring to Zapata and the others involved in Mejia's shooting. (T. 1921). Winfield talked about Herron's song "Rat Hunter," which played in the background of another video, in which Herron rapped that snitches and collaborators deserve to be eliminated; he also talked about "rats" in the music industry. (T. 1927). In another video, Herron talked about "surveying his terrain"; Winfield explained that meant Herron was making sure people were on the job, selling drugs for him. (T. 1915 - 1929). Talking about "Live by the Gun, Die by the Gun," Winfield explained that "big homie" meant a high-ranking member of the Bloods, and that certain hand signals were identified with the Bloods or MMD. (T. 1929- 1932).

Winfield identified individuals appearing in some of the videos, such as Mejia, Walker and Sha. (T. 1934-1944). Regarding the rap song "Man Down," Winfield explained that the lyric "I'm nice with the ox," referred to a razor. He explained that "people in four building washing my socks" referred to Riker's Island. (T. 1934- 1937). As to "Slow Down Remix," Winfield explained that the "Murder Team" is the name of a rap group. (T. 1941- 1944).

CRYSTAL LEWIS testified that she pled guilty to racketeering, narcotics trafficking, and other charges, and was testifying under a cooperation agreement. (T. 2354-55). She sold drugs for Herron from 2003 to 2010. (T. 2316-2325). Lewis identified other individuals who helped Herron sell narcotics, and admitted

that she had acted as a "holster" for him.  (T. 2328- 2332, 2353).  She said that in the fall of 2008, Zapata told her she could not sell drugs in both the Wyckoff and Gowanus Projects.  (T. 2340).  She relayed that conversation to Mejia; afterwards Mejia was shot.  (T. 2341).  Thereafter, Herron asked her to alert him whenever she saw Zapata, which she did, so that Herron could retaliate for Mejia's shooting.  (T. 2342-43, 2396).  Lewis said that she did not know who killed Zapata. (T. 2396).

ALGENIS CARABALLO stated he was facing a life sentence for racketeering and other charges involving Herron, and that he was testifying pursuant to a cooperation agreement.  (T. 2649, 2732).  He said that he was a Blood but not a member of Herron's set, and stated that Herron was "respected and feared" in the projects.  (T. 2665, 2779, 2683).  Although he did not start working for Herron as his driver until mid-2010, had not sold drugs for Herron, and had seen Herron very rarely before that time, Caraballo said Herron "always" had someone carrying a gun for him. (T. 2685-88, 2706, 2743, 2779).  On October 5, 2010, the day of Herron's arrest, Caraballo drove Herron to a club.  He was arrested while driving the car, and a gun was found in the glove compartment.  (T. 2708, 2718).

MUSA MARSHALL, testifying under a cooperation agreement, said he sold crack cocaine at 423 Baltic from December of 2008 until 2010.  He stated that

the drugs came from Herron, who was the leader of the MMD. He explained that Mejia was Herron's "right-hand man." (T. 1712- 1738).

ANGEL FIGUEROA testified that he was in custody, awaiting sentence after pleading guilty to narcotics trafficking, and was testifying under a cooperation agreement. (T. 2812). He sold drugs for Herron, in 1999 and in 2009. (T. 2817-18). Figueroa stated that he had seen Herron with guns, and had witnessed Herron fire guns at people. (T. 2842- 2845). Figueroa explained that he had once alerted the police to Herron's whereabouts, after which Herron threatened to kill him; as a result, he left the neighborhood, retaining drugs that belonged to Herron. (T. 2879). At a later time, Herron forced Figueroa to sell heroin for him, in order to pay him back for the drugs he had taken. (T. 2912-2928).

The Government played an excerpt from the surveillance tape taken on the date of Zapata's killing. Figueroa identified the person in the black hoodie as Herron, based on his build, his gait, and the part of his face that was visible, from the nose down. (T. 2929). From the period of February of 2003 until June of 2014, Figueroa had been almost continuously incarcerated; he had been on the street for only two months during that time. (T. 2944).

ERIC PERRY, FBI Special Agent, testified that he conducted a cell-site analysis on the cell phone number associated with Herron. He analyzed the cell-

site records from September 1 through October 13, 2009. (T. 2601). As to phone activity at approximately 1:00 a.m. on September 27, 2009, he stated that telephone calls involving that phone number placed the phone in the sector around 185 Nevins and 227 Wyckoff Streets. (T. 2619-20).

DETECTIVE CHARLES MARTELLO, NYPD detective, stated he investigated the narcotics trade in and around 423 Baltic Avenue from June of 2008 to early 2011. He identified Government witnesses and others who had been mentioned in testimony as individuals who made drug sales and were arrested in this case. Martello arrested Herron pursuant to a warrant on October 5, 2010. He said that after Herron's arrest, the investigation continued and more charges were brought against Herron. (T. 3067- 3096).

Martello testified that, in the course of the investigation, Herron was never connected to any large sums of cash, bank accounts, real estate, or fleets of automobiles, all of which law enforcement would normally look for in a big drug trafficking operation. (T. 3114- 3115). Since Herron's release from prison in 2007, no illegal drugs had been recovered from him, and no firearms had been recovered from his person. (T. 3117- 3118). He stated there was no wiretap evidence against Herron. (T. 3118- 3122). Martello testified that no undercover police officers ever purchased drugs from Herron, and no confidential informants had been recruited to transact narcotics business with him. (T. 3122). Furthermore, no fingerprints,

fiber, hair, or DNA connected Herron to any of the narcotics or violent crimes that he was charged with. (T. 3124). After 2007, no drugs were every recovered from a car, apartment, house, storage locker, or any container directly attributable to Herron. (T. 3125).

The defense case

After defense counsel provided the names of the witnesses that might be called to testify on Herron's behalf, the judge assigned attorneys to each of them for the purpose of consulting as to whether their testimony would be self-incriminating. (T. 2768, 2803- 2810). Many of those witnesses communicated that they did not want to testify, after which they were allowed to invoke the Fifth Amendment privilege, or were not subpoenad. Defense counsel argued that the court acted improperly when it granted his witnesses the privilege not to testify without first investigating whether they had valid bases for taking the Fifth Amendment, and that, as a result, Herron had been denied a fair trial.[4]

LEONARD GRANT testified that he was a well-known and commercially successful rap musician. From the time he first heard Herron's music in the winter of 2008 - 2009 until Herron's arrest, Grant worked with Herron intensively on his music. He said Herron worked very hard, and Grant paid for Herron's studio time because Herron did not have adequate funds. (T. 3290 – 3304). JONATHAN

---

[4] The facts related to this argument are explained in more detail in Point I.

RICE stated that, after receiving a large settlement from a civil suit, he gave Herron money to help launch his rap career. He said Herron was doing "wonderfully" as a rapper. (T. 3337). Rice testified that both he and Herron belonged to the Bloods, which gave Rice some protection when he was incarcerated. (T. 3304- 3357).

JAMES PETERSON was deemed an expert in the cultural roots of rap music and Hip Hop. (T. 3203). He had reviewed Herron's videos, which belonged to the "gangsta rap" genre. (T. 3204). Peterson explained that gangsta rap includes a tradition in which young, urban black men display "hyper-masculinity," violence, and boastfulness. (T. 3210). He said the genre is characterized by cartoonish exaggeration, and that the appearance of authenticity is important. (T. 3215, 3230). Peterson added there are individuals who have earned huge amounts of money from this music, which has been very dominant in the music industry. (T. 3214).

KENDALE ROBINSON testified that he was shot on September 13, 2008 by Vincent Winfield, who also tried to rob him. (T. 3736, 3742). Robinson was serving a sentence of life without parole for his conviction of murder in the first degree. (T. 3734). SHONDELL WALKER testified that he pled guilty and was awaiting sentence on a drug trafficking case. (T. 3764). He said he never sold drugs or carried firearms for Herron. (T. 3772). He did not know Herron's rank

in the Bloods or MMD, although he knew Herron was not the leader ("big homey") (T. 3786).

The defense also called MICHELE POWER, a Federal Probation Officer, who testified that Angel Figueroa, her supervisee, lied to her about a drug arrest while under supervision. (T. 3382-3395). The defense also called AMI MARAYAG, FBI special agent, to show that in proffer sessions Lewis said she hung out with Viktor Zapata and went half and half with him selling drugs. (T. 3410- 3443).

Thirty-two year old RONALD HERRON testified he was exposed to criminal drug activity during his childhood and adolescence. As a 14-year-old, he was placed in unsecured juvenile detention, for robbery. (T. 3461, 3554-55). In July of 1998, when Herron was 16 years old, the police seized drugs and guns from his mother's apartment. Herron pled guilty to a gun that was not his, and was sentenced to 30 days in jail. (T. 3467, 3470). In March of 1999, he was arrested after Angel Figueroa told the police he was connected with the shooting of Carl Chestnut. He spent 14 months detained at Rikers Island before the charges were dropped. Rikers was "a real barbaric place"; Herron allied himself with the Bloods for protection against the constant threat of assault there. (T. 3474, 3554-55, 3573).

Several months after Herron was released from jail, in October of 2000, Tareek Smalls shot him, causing permanent injury and a limp (T. 3496, 3501). Smalls was killed two days later, while Herron was still in the hospital, by his cousins Naquan King and Thomas Rodwell.[5]  Herron was never charged with the killing or any aspect of it. (T. 3501, 3504).  Herron stated that one of the rap songs played during trial contained a lyric about having someone shot from a hospital bed.  He explained the song was "exaggeration, hyperbole"; he did not shoot Smalls or direct his killing.  (T. 3502, 3575).

From late 2000 to 2001, Herron was selling drugs in the neighborhood; no one worked for him. He was not involved in Brooks' killing, and said he barely knew Saquan Wallace, whose testimony was a fabrication.  (T. 3505, 3511). While serving his 2 to 6-year sentence, Herron decided that, upon his release, he would stop selling drugs, and would pursue a career in rap music.  (T. 3505, 3511, 3522).  He contradicted Winfield's testimony to state that he never had any intention of taking over the drug trade in the projects.  (T. 3543).

Herron said he did not know Richard Russo at all, and denied any involvement in his death.  (T. 3534).  He neither killed, nor ordered the killing, of Zapata.  Herron explained that he was simply adlibbing or fooling around when, upon visiting Mejia in the hospital, he said "see you in the cemetery," and called

---

[5] King was convicted of first degree manslaughter in connection with the killing;  Rodwell testified against him as a cooperator.

his own statement in the video "stupid" and "insensitive." (T. 3533, 3544). He also explained that his rap lyric about "beating a body" referred to beating a case or being acquitted, not to committing an actual crime. (T. 3547).

Government summation

The Government re-played and discussed Herron's videos extensively upon summation. The Government played excerpts from the promotional Project Music videos (T. 3874, 3885-86, 3829), the video clip of Herron visiting Mejia in the hospital and ad-libbing the rap lyric "see you soon in a cemetery near you" (T. 3910-3911), another video excerpt that referred to the "beef" with Zapata (T. 3912), and "Slow Down Remix." (T. 3915).

Verdict and Sentence

On June 26, 2014, Herron was found guilty of all counts. (A. 342-348).

At his sentencing on April 2, 2015, Herron was sentenced to concurrent life terms on counts 1, 2, 3, 5, 6, 8, 12, 13, 15, 17, 18, and 20; he was sentenced to concurrent 20-year terms on counts 9 and 11; he was sentenced to concurrent 10-year terms on counts 16 and 21; and he was sentenced to a consecutive 5-year term on count 4.

As to counts 7, 10, 14, and 19, which charge "crimes of violence," as defined in 18 U.S.C. § 924(c), Herron was sentence to 25-year consecutive terms as to each count. (J(A. 349-356).

## ARGUMENT

### Point I

**HERRON WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE COURT GRANTED HIS WITNESSESS THE PRIVILEGE NOT TO TESTIFY WITHOUT INQUIRING WHETHER THEIR TESTIMONY WOULD HAVE BEEN SELF-INCRIMINATING.**

Before granting the Fifth Amendment privilege to a non-defendant witness, the trial judge must ascertain that the witness has a justifiable fear that his or her testimony could lead to criminal liability. The Supreme Court has held that a witness asserting the privilege against self-incrimination must be "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." Rogers v. United States, 340 U.S. 367, 374 (1951); see United States v. Zappola, 646 F.2d 48 (2d Cir. 1981); United States v. Apfelbaum, 445 U.S. 115, 128 (1980). The Fifth Amendment privilege may be properly granted to a witness when he has a justifiable fear that his testimony could lead to a subsequent prosecution, that his compelled disclosures may increase the severity of a pending sentence, or, if he has an appeal pending, that his testimony might incriminate him upon retrial. It does not extend to facts within a witness's knowledge the divulgence of which have no rational tendency to connect him with the commission of a crime. Thus, "the Fifth Amendment addresses only a

relatively narrow scope of inquiries. Unless the government seeks testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise." Garner v. United States, 96 S.Ct. 1178, 1183 (1976).

Non-defendant witnesses do not have a right to refuse to testify**.** "Non-defendant witnesses are privileged only to decline to respond to inquiries," 1 Charles T. McCormick et al., McCormick on Evidence Â§ 123 (John William Strong ed., 4th ed. 1992) (emphasis added), and must invoke the privilege in response to each question that could yield a self-incriminatory answer. Furthermore, "the witness is not exonerated from answering merely because he declares that in doing so he would incriminate himself -- his say-so does not of itself establish the hazard of incrimination." Hoffman v. United States, 71 S.Ct. 814, 818 (1951). As a result, trial courts have a duty to scrutinize a witness's invocation of the privilege. To fulfill that duty, this Circuit has repeatedly held that the trial court must conduct a "particularized inquiry to determine whether the [Fifth Amendment] assertion was founded on a reasonable fear of prosecution as to each of the posed questions." Zappola, 646 F.2d at 53.

The trial court in this case abandoned this critical responsibility. The judge granted the privilege without examining the potential witness's assertions that their testimony would be self-incriminatory. He refused to consider that the Fifth

Amendment privilege could be granted selectively, outside of the jury's presence, as to any particular questions that were actually incriminating. This Court has long recognized that claims of privilege under the Fifth Amendment should be carefully scrutinized since allowing a witness not to testify compromises the Sixth Amendment right of an accused to have compulsory process for obtaining witnesses in his favor. <u>United States</u> v. <u>Rodriguez</u>, 706 F.2d 31 (2d Cir.1983). By granting the privilege based on the defense witness's blanket assertions that all testimony would be self-incriminating, the court denied Herron his right to a fair trial.

Recognizing that the issue of self-incrimination could arise with regard to proposed defense witnesses, the court assigned an attorney to each of them. (A. 310-315, see Government letter of June 13, 2014, A. 305-07). Thereafter, it engaged in a constitutionally flawed process. After contacting the witnesses, some of the attorneys represented that their clients would not testify (A. 304, 308) and the court granted them the privilege not to testify without ascertaining on what basis they had requested it. Herron was particularly interested in securing the testimony of Stacy Knight and Diane Flowers. Counsel pressed the court to conduct the required inquiry regarding Knight; in response, the court did nothing more than inquire whether Knight understood the Fifth Amendment privilege and wanted to invoke it to refrain from testifying. Counsel urged the court to engage in

an inquiry regarding Flowers as well, but ultimately chose not to subpoena her when it became clear that she, like Knight, would be allowed to invoke the privilege as to all of her testimony without adequate justification.

Neither Knight nor Flowers were in custody, and there was no indication that any criminal prosecutions or investigations were pending against either of them. Knight's attorney stated he had advised Knight to invoke the privilege on any "substantive questions," a term that was never defined. The trial court then asked Knight whether he intended to testify, to which Knight responded he would "relinquish from testifying." (T. 3102-03). Herron's counsel asserted there was no valid ground that would justify Knight's being granted the privilege, and requested a hearing to examine the issue. (T. 3104). The court agreed to hold a proceeding later in the day, but signaled that its' intention was merely *pro forma* when it said, "We don't need Mr. Knight here for that frankly." (T. 3104).

The only question the judge asked at the subsequent proceeding was whether Knight intended to assert the Fifth Amendment privilege. There was no inquiry as to his basis for seeking to do so. Without posing any substantive questions to Knight, the court decided that Knight would take Fifth , presumably in response to any and all questions asked including innocuous, non-incriminatory ones. (T. 3241-3242). Herron's counsel asked for the opportunity to specify the questions he wanted to ask Knight so that the parties could discuss whether there was a real

risk of self-incrimination that would justify the court's decision.  In response, the court asserted, without explanation, that it accepted "his [Knight's] decision" not to testify, and excused him.  (T. 3243- 3244).  The court flatly rejected the possibility that a witness could take the Fifth as to some questions and not others, and that it had a responsibility to determine which questions would be self-incriminatory.  It stated:

> There's a problem here. The problem is that you may ask your questions and the government may ask its questions and he may wish to assert his Fifth Amendment right as to their questions <u>and the court has no intention of parsing whether the Fifth Amendment applies to their questions as opposed to your questions.</u> . . .  you can make your record, but I'm not changing my mind. (T. 3244).

Having made its decision, the court allowed defense counsel to make a record concerning what he would have asked Knight.  Counsel stated he had intended to ask Knight how he knew Herron, and his understanding and involvement in Herron's career as a musician.  He said Knight would likely testify that he was a member of the Bloods and would talk about his reasons for joining the group that had nothing at all to do with criminal activity.  (T. 3245).

The court's flawed process was repeated as to Diane Flowers:  the judge confirmed with her that if called to testify she would invoke the privilege, but did

not ask on what basis the privilege could be justified. (T. 3100). Counsel explained that, were Flowers to testify, she would likely invoke the Fifth as to certain specific questions – whether she received a gun from Gonzalez or handed guns to somebody else – inferring that he did not expect her to invoke the Fifth as to everything he planned to ask. However, having seen the court address the same question regarding Knight and knowing the court would allow Flowers to invoke the privilege regardless of whether there was a basis for doing so, counsel explained that he had spoken to Flowers previously and she had always intended to testify voluntarily. He would not subpoena her solely so that she could take the Fifth. (T. 3108).

While addressing the court concerning Leonard Grant and other witnesses, Herron's counsel argued that the court's procedure posed a danger to Herron's Sixth Amendment right to put on a case. (T. 3144). The trial court responded:

> "I have an obligation to this witness. Forget your client for a minute. . . . . I take real exception to your raising the question of a Sixth Amendment right in connection with this individual's . . . Fifth Amendment rights. It is not fair." (T. 3143-44).

The trial court erred when it did not engage in a "particularized inquiry to determine whether the [Fifth Amendment] assertion was founded on a reasonable fear of prosecution as to each of the posed questions." Zappola, 646 F.2d at 53.

Unlike Knight and Flowers, for whom there was no evidence of potential criminal jeopardy, the witness in <u>Zappola</u> was under indictment at the time of trial and may have been under further investigation. Since this Court reversed <u>Zappola</u> when the trial court's simple acceptance of Zappola's blanket assertion of the Fifth amendment privilege in response to all questions asked of him was error, there can be no doubt that the lack of inquiry in this case constituted error.

This Court has often held that a particularized inquiry is required before a witness may invoke the Fifth Amendment. See, e.g., <u>United States</u> v. <u>Cimino</u> 2016 WL 386061 (2d Cir. 2016) (district court conducted the required "particularized analysis" when defense counsel posed questions to the confidential informant outside the presence of the jury; no error in concluding that the questions could incriminate the informant with respect to unauthorized criminal activities); <u>United States</u> v. <u>Lumpkin</u>, 192 F.3d 289 (2d Cir. 1999) (witness, who was awaiting sentence, could invoke privilege when defense counsel's detailed questions at hearing outside of jury's presence demonstrated her testimony could lead to perjury prosecution); <u>United States</u> v. <u>Rodriguez</u>, 706 F.2d 31 (2d Cir. 1983) (court properly allowed witness to invoke privilege when, after inquiry, it learned of pending Grand Jury investigation related to her potential testimony).

Such a particularized inquiry may require that the witness be allowed to invoke the Fifth Amendment as to some questions but not as to others. For

example, in <u>United States</u> v. <u>Tutino</u>, 883 F.2d 1125 (2d Cir. 1989), after a specific inquiry, the witness testified about tapes he had made in cooperation with the Government, but was allowed to take the Fifth regarding his activities before he began cooperating, because the trial court correctly concluded he had a legitimate fear of prosecution regarding those activities. Using the procedure adopted in <u>Klein</u> v. <u>Harris</u>, 667 F.2d 274 (2d Cir. 1981), defense counsel in this case suggested there could be a waiver of privilege on direct with selective waiver on cross, if necessary, as to items outside the scope of the direct.

In this case, the trial court repeatedly referred to "the witness's decision," as though whether the witnesses wanted to testify was the criterion for determining whether to extend the privilege. However, "a witness' mere unwillingness to testify is inadequate to sustain a fifth amendment claim." <u>United States</u> v. <u>Bowe</u>, 698 F.2d 560, 555-556 (2d Cir 1983) (at suppression hearing, no further inquiry when witness responded to the judge's inquiries that she would "not like" to, and was unwilling to testify); <u>see</u>, e.g., <u>Piemonte</u> v. <u>United States</u>, 81 S.Ct. 1720 (1961); <u>United States</u> v. <u>Doe</u>, 478 F.2d 194 (1st Cir.1973). With no inquiry other than the willingness of the witness to testify, it is impossible to  know if the witness has a  legitimate fear of self-incrimination, or other concerns that do not trigger the Fifth Amendment privilege, such as a fear for personal safety. Furthermore, the court misconstrued the nature of its obligation to protect the

witnesses when it refused to balance their Fifth Amendment rights against Herron's right to compulsory process under the Sixth Amendment. The court's obligation to the witnesses was to appoint lawyers for them and make sure they were protected during the required inquiry as to the whether their testimony was self-incriminating, not simply to ascertain their wishes about testifying.

While the court appeared to act out of concerns that had legitimacy, none of those concerns prevented the court from conducting a careful and thorough inquiry before granting the privilege. Of course, the court wanted to ensure that the defense would not call witnesses solely to have them take the Fifth Amendment before the jury for the purpose of creating an unfounded inference that would benefit Herron. That concern could have been easily remedied by holding a hearing, and the invocation of the Fifth Amendment privilege if warranted, outside of the jury's presence. The concern that witnesses not be compelled to make incriminatory disclosures during the inquiry process itself can be accommodated by assigning each witness an attorney, and, if necessary, by holding consensual, *ex parte* proceedings. See, e.g., United States v. Gonzalez, 2000 WL 1844762 (S.D.N.Y. 2000) (defendant waived "his right" to examine the witness in court to test whether his assertion of the privilege was valid; with consent of both parties, court conducted *ex parte* examination of witness's attorney).

## Harmless Error Analysis

Because of this profound error, this Court should reverse these convictions without determining whether Herron was prejudiced: harmless error analysis should not apply in this situation. While the existence of a federal constitutional violation does not compel relief in every case, <u>Chapman</u> v. <u>California</u>, 87 S.Ct. 824, 826-27 (1967), this Circuit has ruled that <u>Chapman</u> does not apply to Constitutional error that has the effect of permeating the entire proceeding, and where harmless error analysis would inevitably entail speculation. <u>United States</u> v. <u>Gallo</u>, 859 F.2d 1078 (2d Cir. 1988).

In this case, the judge's decisions regarding Herron's witnesses precluded him from defending himself effectively. The error constituted a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process" <u>Neder</u> v. <u>United States</u>, 119 S.Ct. 1827, 1833 (1999) quoting <u>United States</u> v. <u>Fulminante</u>, 111 S.Ct. 1246 (1991); it infected the entire trial, necessarily rendering it unfair. The Sixth Amendment right to compulsory process and the fundamental right to have a defense are basic protections that fall into the limited class of cases that demand automatic reversal, similar to the denial of a public trial, <u>Waller</u> v. <u>Georgia</u>, 133 S.Ct. 2276 (1984) and the denial of the right to self-representation at trial. <u>McKaskle</u> v. <u>Wiggins</u>, 104 S.Ct. 944 (1984). Without such

basic protections, a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence.

In addition, it would be virtually impossible to engage in harmless error analysis in this case because this Court can only speculate about what the defense witnesses might have said had they been required to testify. It is not possible to hazard even a reasonable guess as to whether the testimony might have led to a different result regarding any of the counts charged. Thus, the facts presented here are fundamentally different from those of United States v. Arias, 404 Fed.Appx. 554 (2d Cir. 2001), a Summary Order in which this Court found harmless error where a confidential informant was improperly allowed to invoke the Fifth Amendment. In Arias, because the trial court had engaged in the kind of particularized inquiry of the informant that was absent here, it was clear that the testimony of an FBI special agent substantially overlapped with the questions the defendant wanted to ask the informant. Knowing what the informant's testimony would have been had he not invoked the Fifth, the court was able to apply harmless error analysis without undue speculation.

In contrast, because the judge in this case abandoned his responsibility to engage in a "particularized inquiry," we can only speculate as to the effect that Knight's and Flowers' testimony could have had on the jury. Diane Flowers' testimony could have been crucial for the defense since she was a "fact" witness,

who had been involved in some of the transactions discussed by Government witnesses at trial. Since the Government had adduced testimony from the cooperators about the Bloods, Knight's testimony concerning his membership and experience in the organization could have had a large influence on the jury.

However, should this Court determine that harmless error analysis applies, it should find that the error was not harmless in light of the poor quality of the Government's evidence. The Government's case against Herron relied heavily on the testimony of cooperators who were facing drastic sentences, many of whom were demonstrated liars. Other than such dubious testimony, proof that Herron had engaged in racketeering for a 12-year period during which he was the head of a significant drug trafficking operation was insubstantial at best.

As to the homicide charges, there was no physical evidence that connected Herron to any of the killings – none of his DNA, fingerprints, or any other tangible evidence was found at the murder scenes, and no physical evidence connected Herron to the murder weapons. Regarding Russo's killing, the only witness, Feo, told Garcia that the killing was "my bad," a popular term for assuming responsibility. Feo, unlike Herron, had a demonstrated motive for the killing – Russo had held his brother at gunpoint – and he did not come forward with this account until 5 years afterward, upon his own arrest. Evidence of a connection between Herron and the Zapata killing was similarly inadequate. There were no

witnesses to the killing; instead cooperators, whose veracity was suspect, testified that Herron was searching for Zapata for the purpose of retaliation. Apart from that testimony, the Government produced only cell site records that purported to show that his cellphone was in the vicinity of the Zapata homicide near the time it took place, which was hardly surprising since Herron lived in the projects, and a surveillance video showing a tall man, whose face was obscured by his hoodie, running from the lobby near the Zapata killing. While Hudson, Saunders, and Pack testified concerning the Brooks killing, Hudson and Pack admitted to having had limited viewpoints, and the testimony of all three was full of significant contradictions.

There was even less evidence of Herron's involvement in the drug trade. Over the entire 12-year period, Herron was never caught on videotapes or wiretaps in the course of buying, selling, negotiating, or arranging a drug transaction. After his release from prison in 2007, no drugs were every recovered from him, nor from any apartment, car, suitcase, or any storage facility associated with him. No undercover police officers ever purchased drugs from Herron, and no confidential informants had been recruited to transact narcotics business with him. Nor was Herron ever connected to any large sums of cash or luxurious possessions that might have evidenced that he benefitted from an extensive drug operation. Although one would expect an important drug trafficker to be associated with

firearms, since the time of Herron's release from prison no guns had been recovered from his person.

Where legal error is found, it is deemed harmless only when courts "possess a sure conviction that the error did not prejudice the defendant." <u>United States</u> v. <u>Dhinsa</u>, 243 F.3d 635, 649 (2d Cir. 2001). The preclusion of Herron's witnesses was legal error. Under the circumstances of this case, this Court cannot be convinced that the error did not prejudice Herron. Thus, his convictions should be vacated.

<u>Point II</u>

THE COURT ERRED WHEN IT ALLOWED THE GOVERNMENT TO DISPLAY HERRON'S RAP MUSIC VIDEOS, WHICH WERE INFLAMATORY, PREJUDICIAL, AND UNNECESSARY TO THE GOVERNMENT'S CASE.

Over Herron's objection, the Government introduced numerous videos in which Herron performed rap music and spoke, using brash and insolent language, replete with profanity and boasting. Displaying these videos as part of the Government's proof was prejudicial because of the high probability that the jury would misconstrue them as authentic insight into Herron's character and use them as proof of the acts charged, rather than what they actually were: music produced

for commercial purposes in the "gangsta rap" genre. The danger that the jury would view the videos as evidence of Herron's propensity to commit the crimes charged, or worse – as quasi-confessions – was enormous. Such videos could only taint the jury's view of Herron, inducing them to believe that he was a morally repugnant individual. These videos were central to the Government's case: the Government discussed them in its opening, played them throughout the trial, and showed excerpts of them upon summation. Because of their admission, and the focus that the Government put upon them, Herron was denied a fair trial.

A district court's evidentiary rulings are subject to review for abuse of discretion. <u>United States</u> v. <u>Curley</u>, 639 F.3d 50 (2d Cir. 2011). Under that standard, this Court should rule that the lower court erred in allowing the jury to view these videos.

Following the rap music convention in which the rapper speaks in the first person, the jury watched Herron in six different videos as he looked into the camera and intoned menacing, violent lyrics, such as "nigga bleed real slow . . . left his brain exposed, with the fecal on the floor" and "see you real soon in a cemetery near you."[6] In accordance with the gangsta rap form that has been

---

[6] The videos admitted during Vincent Winfield's testimony were: "Live by the Gun, Die By the Gun," "Slow Down Remix," "Man Down Tycoon Dynasty," "Project Music 1, (Part 2)," and "Project Music 3." During Garcia's testimony, the Government displayed "Project Music 1, Part 1." The lyrics to these videos are available at A. 292-301. In addition, see A. 286- 301 for a brief description of each of the videos, their full running time, and the running time of the

commercially successful, Herron's lyrics contained violent images and curse words. In other, equally prejudicial videos that Herron made in order to promote his rap career, he was seen as the rapper "RA Diggs," surveying his neighborhood terrain.[7] Juxtaposed against the formality of a Federal trial, the overpowering screen image of Herron uttering such crude, cruel, and dangerous thoughts could only have had a profoundly disturbing effect on the jury. The videos painted Herron in a negative light that he could not overcome regardless of the quality of the evidence produced against him.

The videos should have been excluded because they were overwhelmingly prejudicial, cumulative, only minimally probative, and they violated Mr. Herron's right to freedom of expression. Because the videos pervaded the trial, this error cannot be deemed harmless.

In weighing the admissibility of potentially inflammatory evidence against a defendant, a trial judge is required to consider the risk of unfair prejudice and to balance that risk against probative value. <u>United States</u> v. <u>Figueroa</u>, 618 F.2d 934, 943 (2d Cir. 1980). Clearly, all material evidence introduced against a defendant tends to prove guilt, however evidence becomes prejudicial when it has an adverse

---

Government's proposed excerpt. Herron played another rap video as part of the defense case, but it was played without sound.

[7] The Government labelled these types of work "documentary videos" as opposed to music video. However, they were made for the purpose of promoting the rapper "RA Diggs," not for documenting the real life of Herron.

effect upon a defendant beyond proving the fact that justified its admission. Prejudice is created when the evidence proves an adverse fact that is not actually at issue, or, as in this case, it "unfairly excite[s] emotions against the defendant," arouses the jurors' sense of horror, or provokes an instinct to punish. Figueroa, 618 F.2d at 943; Weinstein's Federal Evidence § 403.04 [1].

The district court must "conscientiously balance" the proffered evidence's probative value with the risk for prejudice, United States v. Awadallah, 436 F.3d 125, 131 (2d Cir.2006), otherwise its conclusion may be disturbed upon appeal as arbitrary. "To avoid acting arbitrarily, the district court must make a "conscientious assessment" of whether unfair prejudice substantially outweighs probative value." United States v. Salameh, 152 F.3d 88, 110 (2d Cir.1998) (per curiam) (quoting United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982)).

Herron sought to preclude all of the videos and their audio content as prejudicial, barely probative, and cumulative. (Defendant's motion in limine, A. 206-226). In response, the Government claimed that the video excerpts were relevant and more probative than prejudicial – they would show the existence and purpose of the charged enterprise, Herron's role as its leader, the relationship of trust between the members, Herron's possession and use of firearms, and specific crimes Herron committed to further the goals of the enterprise. (Government's Memorandum of Law in Opposition to Defendant's Motion in Limine, **A**. 227-

239).  The lower court found the videos admissible as "generally relevant." While it conceded that the videos "contain profanity, misogyny, and references to violence that viewers could find objectionable or shocking," the court ruled that their prejudicial effect did not outweigh their probative value.  (Memorandum & Order, A. 269).  Having concluded that the Government's cherry-picked excerpts were particularly prejudicial, defense counsel, while adhering to the view that none of the videos should be admitted,  asked that they be played in their entirety so that the jury could have a full and appropriate understanding of the purpose and context of the songs and other materials. (**A.** 286).

In ruling that the videos were more probative than prejudicial, the trial court's cursory analysis relied entirely on United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999), in which this Court stated that evidence is not unduly prejudicial when it is not "more inflammatory than the charged crimes."  Reliance on that case was misplaced.  There, the defendant was a police officer charged with causing the death of an arrestee by choking him, an act that the policer officer claimed was unintentional.  In order to rebut the officer's defense, the Government introduced evidence that the officer used a choke hold in a prior arrest. This Court found that evidence of the earlier choke hold - virtually identical behavior – was not more inflammatory than the charged crime, and thus was not overwhelmingly prejudicial. See also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (in

prosecution for possession of cocaine, evidence of prior crack possession no more inflammatory than charged crime);     United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (in prosecution for narcotics trafficking, evidence of prior narcotics transactions were no more disturbing than those charged);     United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (no undue prejudice where the other criminal charges are less serious than the charged crime).

In Livoti, the challenged evidence was testimony demonstrating the same behavioral pattern as the crime charged.  In contrast, the videos in this case were intrinsically distinct from mere testimony:  both the format and content were purposely offensive, intentionally inflammatory, repulsive, and provocative works of fiction.  In holding that these videos would be no more inflammatory than the charged behavior, the court underestimated the negative, visceral impact of these visual and aural representations of an audacious character rapping about the violent life of an urban gangster.  In a prosecution for providing material support to terrorist organizations, this Court reversed when the lower court admitted video, photos and an eyewitness account of a violent suicide bombing by those terrorist organizations.  In reversing, the Second Circuit called the evidence a blatant appeal to the jury's emotions and prejudices, and concluded that "given the highly charged and emotional nature" of the evidence and its minimal evidentiary value, the lower court's decision had to be deemed arbitrary." United States v. Al-

Moayad, 545 F.3d 139, 160 (2d Cir. 2008). Similarly, this Court should find that these videos were unduly prejudicial, and that the Livoti analysis was erroneously applied.

Furthermore, the videos were superfluous to the Government's case, and their admission violated F.R.E. Rule 403, which bars the "needless presentation of cumulative evidence." In United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2011), this Court pointed out that:

> [T]he availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence . . . If the incremental value is slight, and the possibility of prejudice through misuse by the jury great, the court should exclude the evidence under Rule 403 (emphasis added). Rule 404.21.

A court errs when it admits evidence that has a high possibility of jury misuse and only slightly more probative value than other evidence on the same issue. See Old Chief v. United States, 519 U.S. 172, 185 (1997) ("[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point"). Here, the Government argued that its purpose in playing the videos was to show that Herron identified as a gang member, fired weapons, vowed retaliation after an alleged associate was shot by a rival, and bragged that other people would do his bidding. However, everything the Government sought to adduce through the inflammatory videos was also clearly

elicited through the cooperators' testimony, and the videos did not offer any new information. Numerous witnesses, including Herron himself (T. 3596), testified to his membership in MMD, thus that issue was not in dispute. The association between Herron and particular individuals that was shown in the videos was demonstrated repeatedly by the witnesses, who also testified to possessing and using weapons. Winfield related that Herron and he planned lethal retaliation for Mejia's shooting; the rap lyric "see you in a cemetery near you" was simply a redundant, but far more macabre version. Here, the videos were comparable to the "propensity evidence in sheep's clothing" that was condemned in McCallum, 584 F.3d at 477. Because the facts that the Government sought to prove through the videos were cumulative and, in some cases, irrelevant to any disputed issue, the lower court abused its discretion by admitting the videos.

The videos should have been prohibited as well under the language of F.R.E. Rule 403 that bars evidence when there is a danger that it will confuse the issues or mislead the jury. In this case, there was a substantial risk that the jury would wholly equate the character and stories portrayed in the videos by RA Diggs with the actual crimes and bad acts evidence with which Herron was charged, and see no distinction at all between the lawbreaker-character he played in the videos and the real person on trial. Obviously, the song lyrics were not actual evidence that Herron had committed the acts. While the defense was free to argue that point

to the jury, the risk of confusion was so great – and the necessity for such evidence so slim – that the videos should have been prohibited.[8]

While the Government argued on summation that it was the defense – not the Government - that put the focus on the videos, once the court decided to admit them, the defense had little choice but to assume the burden of explaining the context from which they came in order to refute the inference that the videos were the recorded confessions of an outlaw.    Thus, Herron put on two witnesses, in addition to an expert on gangsta rap, to demonstrate that his musical talent was taken seriously in the professional rap music world, that he had a successful, seasoned collaborator, and an investor.    In the end, the court's erroneous decision to admit the videos rendered it necessary for the defense to dispel the harm that they caused.

---

[8] An example of rap lyrics that presented a danger of jury confusion were found in the songs "Live By the Gun Die By the Gun" ("Nigga shot me five times, Two days later the nigga died") and "Slow Down" ("I don't respect the shooter cause he shot me in the legs/ And two days later the little nigga was dead/ See if he was smart he would've shot me in the head/ Cause I can get you shot from a hospital bed"). (A. 292, 300).   The Government related those lyrics to the killing of Tareek Smalls, who was killed two days after he shot and wounded Herron, while Herron was still in the hospital.  The killing occurred in October of 2000, years before the song was written, when Herron was 18-year-old.  Herron was not charged with killing Smalls, with ordering the killing, or any involvement whatsoever.  Herron's older cousins, Naquan King and Thomas Rodwell, were convicted of the killing.  The Government argued that rap lyrics of this type, which they used repeatedly in their case, demonstrated Herron's power and position. However, there was an enormous danger that the jury would think Herron had been involved in the actual killing. While Peterson testified that bragging about being powerful is a part of the image typically cultivated in the gangsta rap tradition, the Government's  use of these lyrics was misleading, and the danger that the jury would view them as a confession to the killing was great.  These and other lyrics should have been excluded pursuant to FRE 403.

In addition, the videos were artistic expression entitled to protection under the First Amendment, and this Court would be remiss were it to view the question of their admission solely as an evidentiary issue. Courts should not "sustain a conviction that may have rested on a form of expression, however distasteful, which the Constitution tolerates and protects." Street v. New York, 394 U.S. 576, 594 (1969). Regardless of whether one finds the videos effective as art or commentary, there can be no doubt that their fictional portrayals of urban life was intended as social commentary, and that, as such, they should have be given special Constitutional protection. Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011).

In State v. Skinner, 218 N.J. 496, 521, 95 A.3d 236 (2014), the New Jersey Supreme Court overturned a conviction where the government's case at trial relied heavily on violent rap lyrics, observing that the lyrics were artistic, and not literal, in intent: the court observed that "[o]ne would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff." 218 N.J. 496, 521, 95 A.3d 236 (2014). In this case as well, the videos fall under the ambit of the First Amendment and should not have been admitted.

This Court's decision in United States v. Pierce, 785 F.3d 832 (2d Cir. 2015), which allowed the admission of one rap video under very different circumstances than existed in this case, should not govern here. In Pierce, the defendant appeared in the video delivering a message in coded language that was

deciphered for the jury by the Government's cooperating witness. Thus, the Government had a specific, cogent reason for its admission. Moreover, the quantity of the videos admitted in this case distinguishes it from Pierce as well as from other cases that have allowed the admission of handwritten rap lyrics consisting of only a few lines, or even a single lyric. See United States v. Wilson, 493 F.Supp. 2d 484, 488-89 (E.D.N.Y. 2006) (several lines of handwritten lyrics admitted); United States v. Stuckey, 253 F. Appx 468 (6th Cir. 2007) (affirmed, admission of three lines of handwritten verse) United States v. Foster, 939 F.2d 445 (7th Cir. 1991) (same). In Pierce, one rap video that, while prejudicial, had a specific purpose in the Government's case was admitted. In this case, by allowing the admission of six inflammatory videos, the lower court crossed a dangerous threshold that this Court should not condone.

Erroneously admitted evidence may be deemed harmless if it is unimportant in relation to everything else the jury considered, Cameron v. City of New York, 598 F.3d 50, 61 (2d Cir. 2010); "the most critical factor," in determining harmlessness is "the strength of the government's case." McCallum, 584 F.3d at 478. Given the insufficiencies in the evidence against Herron, see Point **I,** pages 41-43, this Court cannot be reasonably assured that the jury's judgement was not substantially swayed by the erroneous admission of the videos

In conclusion, the videos were a blatant attempt to invoke the jury's most negative reactions and prejudices against Herron. They could do nothing but turn the jury against Herron for reasons that had nothing to do with the evidence in the case. They were Herron's attempt to earn legitimate money by producing music that has proven commercial value. These videos, whose raw, violent quality was overwhelming, were highly prejudicial, unnecessary, only minimally relevant, and their admission violated Herron's First Amendment rights. Because of their admission, Herron did not receive a fair trial and his convictions should be reversed.

Point III

CELL-SITE RECORDS SHOULD HAVE BEEN SUPPRESSED WHEN THERE WAS NO PROBABLE CAUSE FOR THE ORDER UPON WHICH THEY WERE ISSUED, AND THE GOOD FAITH EXCEPTION DID NOT APPLY.

The Government relied on historical cell-site data to establish that Herron was present in the vicinity of the Wyckoff Houses at the time Victor Zapata was killed. Herron moved to suppress the cell-site information, arguing that the Government lacked probable cause to obtain the Authorization Order. In addition, Herron requested a Franks hearing to challenge the affidavit that was used to obtain the Order, noting that the affidavit made no reference whatsoever to the Zapata killing and its investigation. (A. 113-132). The court denied Herron's

motion, relying solely on the good faith exception to the exclusionary rule. That ruling was erroneous.

Disclosure of the historical cell-site information that is linked to an individual's mobile telephone, and which reveals the whereabouts of that phone over a protracted period of surveillance, should be deemed a "search" for purposes of the Fourth Amendment. As such, a showing of probable cause for the disclosure should be required. In this case, because probable cause was not demonstrated and the good faith exception to the exclusionary rule was not properly applied, the court's ruling was in error. This Court reviews the lower court's ruling on a motion to suppress evidence *de novo*. United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir.2009); under that standard, this Court should reverse the ruling.

On October 9, 2009, the Government submitted a sealed application, pursuant to 18 U.S.C. § 2703(c)(l) and (d) of the Stored Communications Act (SCA), directing Sprint to disclose historical cell-site information pertaining to a cell phone number reportedly used by Herron for the period from September 1, 2009 until the date the court issued the proposed Order. The application contained sworn allegations about how the information was expected to provide evidence that Herron was engaged in drug trafficking. The Order was granted on October 13, 2009. (Memorandum and Order, A. 193-194).

There is no dispute that the Government did not establish probable cause for the disclosure of the cell-site records. The Government did not attempt to establish probable cause, and instead assumed that its allegations sufficed to meet the standards set forth in the SCA, 18 §2703(c)(1) and (d), which requires merely "specific and articulable facts," in essence a reasonable suspicion standard.

Herron urges this Court to rule, as did the Fourth Circuit in United States v. Graham, 796 F.3d 332 (4th Cir. 2015) that "the government conducts a search under the Fourth Amendment when it obtains and inspects a cell phone user's historical [cell-site location information] for an extended period of time" and that obtaining such records requires a warrant. 796 F.3d at 344-45. Graham stated that ordering a cell phone provider to hand over "extended" cell site data pursuant to a § 2703(d) is a search because "society recognizes an individual's privacy interest in her movements over an extended time period." Id at 349. Given the ubiquity of cell phones in all private spheres of life, and the fact that technological progress continues to advance upon the individual's zone of privacy, the Court sought to err on the side of protecting privacy, accounting for the practical realities of modem life.

The Fourth Circuit relied primarily on arguments of the D.C. Circuit's opinion in United States v. Maynard, 615 F.3d 544 (D.C. Circuit 2010), and the concurring opinions when that case reached the Supreme Court under the name of

United States v. Jones, 132 S.Ct. 945 (2012) (prolonged electronic surveillance of an individual's location via the attachment of a GPS tracking device to a vehicle without a warrant constituted a Fourth Amendment search). In the concurring opinions, Justices Sotomayor and Alito noted that the trespass-based approach was neither necessary nor sufficient to trigger Fourth Amendment protections. Of far more significance was the violation of the individual's expectation of privacy, where "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." Jones,132 S. Ct. at 955.

The privacy interests affected by long-term GPS monitoring, as identified in the Maynard and the Jones concurrences, apply with equal or greater force to historical cell-site data. See Commonwealth v. Augustine, 467 Mass. 230, 4 N.E.3d 846 (Mass. 2014) (cell-site data implicates the same nature of privacy concerns as a GPS tracking device). Long-term location information disclosed in cell phone records can reveal both a comprehensive view and specific details of an individual's daily life. Cell-site data may provide even more private information about an individual than the GPS monitoring that was challenged in Jones, since the surveillance in that case was limited to the movements of a car on public roads. In contrast, cell phones, often hidden in clothing or handbags, are carried into the private sphere of homes and businesses. Thus, unlike GPS monitoring of a vehicle,

examination of cell-site data permits the government to track a person's movements between public and private spaces, or within the privacy of her home.

In contrast to the Fourth Circuit, the Eleventh Circuit, in <u>United States</u> v. <u>Davis</u>, 785 F.3d 498, 511 (11th Cir.2015) (en banc), and the Fifth Circuit, in <u>In re United States for Historical Cell Site Data</u>, 724 F.3d 600, 611-613 (5th Cir. 2013), have both held that the defendants did not have a reasonable expectation of privacy in the cellular company's records of the cell towers utilized by their cell phones. <u>Davis</u> was based largely on the "third-party doctrine," which states that a cell phone user has no reasonable expectation of privacy in records held by his service provider. That approach was squarely rejected in <u>Graham</u> because the "granular" level of location information contained in cell service records implicated privacy concerns. 769 F.3d at 350. Likewise, <u>Graham</u> rejected the Fifth Circuit's rationale, that cell site information is not constitutionally protected because callers voluntarily convey the data to their mobile providers, because location information automatically collects with the provider, even when the phone is not being used, implicating heightened privacy protections. <u>Id</u>. at 353-56.

In this case, instead of determining whether the Order authorized a search demanding Fourth Amendment protection, as Herron urged, the lower court relied on the "good faith exception" to the exclusionary rule to deny suppression of the records. Under the exception, evidence seized pursuant to a warrant for which

actual probable cause does not exist or which is technically deficient is admissible if the executing officer relied on the warrant in "objective good faith." United States v. Leon, 468 U.S. 897, 923 (1984). The lower court pointed out that, at the time the application for these records was made, courts held that § 2703(c) permitted the Government to obtain historical cell-site data based on applications articulating "specific and articulable facts." United States v. McCullough, 523 Fed.Appx. 82 (2d Cir. 2013) (good faith exception would have applied to request for cell site data since § 2703(c) not "clearly unconstitutional" at the time officer obtained the evidence); United States v. Mack 2014 WL 6085306 (D. Conn. 2014) (same).

However, under Leon, the good faith exception does not apply if the magistrate who issued the warrant was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks v. Delaware, 438 U.S. 154,155-56 (1978)). The application in this case did not mention that the Government's purpose for seeking the records was its investigation into the killing of Victor Zapata, which occurred on September 27, 2009, less than two weeks before the application was submitted. Instead, the affidavit merely recited that the information was needed to explore potential violations of federal narcotics laws.

The Government's intentional withholding of this information should have precluded the application of the good faith exception.

In response to Herron's suppression motion, the Government asserted that, because Zapata's murder was a direct result of a dispute among drug traffickers, the affidavit did not contain misrepresentations and was therefore adequate. However, there is no doubt that the Government's incomplete justification for requesting the cell-site records pertaining to Herron's phone just days after Zapata's killing - that he was the leader of a narcotics operation – was incomplete and misleading, when the Government actually wanted the records in order to investigate the murder. In deciding whether an Authorization Order should be issued, judges need sufficient knowledge of the underlying facts upon which to base an informed judgment, otherwise their "decisions" are simply a rubber stamp of the Government's request. In this case, the Government advanced no reason why, using the sealed affidavit process and *ex parte* procedure, they were justified in omitting this crucial information from the warrant application. This Court has stated that the good faith exception requires a reasonable belief that the warrant is based on a valid application of the law to "all the known facts," United States v. Reilly, 76 F.3d 1271, 1273 (2d Cir. 1996); furthermore, the exception does not provide an excuse where the police are not frank with the magistrate in the *ex parte* proceedings to obtain the warrant (good faith exception did not apply where

officer's bare bones allegations omitted facts). See also United States v. Steppello, 733 F.Supp.2d 347 (N.D.N.Y. 2010) (no good faith exception where application omitted crucial facts and was misleading), rev'd on other grounds (see ftn. 8), 664 F.3d 359 (2d Cir. 2011);

Furthermore, the court erred when it did not grant a Franks hearing. A challenge to the veracity of an affidavit merits a hearing if the challenger makes a preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and if the allegedly false statement was "necessary to the finding of probable cause." Franks v. Delaware, 98 S.Ct. 2674, 2676 (1978). Intentional or reckless omissions of material information, like false statements, may serve as the basis for a Franks challenge. See United States v. Campino, 890 F.2d 588, 592 (2d Cir.1989). Clearly, the court should have granted a hearing in this case.

This error cannot be deemed harmless. There were no eyewitnesses to the Zapata killing, and no ballistics, DNA, or fingerprint evidence linking Herron to the weapon or the murder scene. Lewis and Winfield testified that Herron was looking for Zapata to kill him, but Lewis said she did not know who actually killed Zapata, and Winfield, who was arrested on a gun charge before Zapata was killed, did not indicate that he had any knowledge. Apart from Herron's rap lyric "see you in a cemetery," and the cooperators' testimony regarding Herron's motive, the

Government's only other evidence for the Zapata killing was a surveillance video that showed a partial view of an assailant in a hoodie leaving the lobby at the time and date of the killing, and the cell-site information. The Government demonstrated that it relied heavily on the cell-site data when the prosecutor stated upon summation, "We know where defendant was on the night of the murder of Zapata because of the cell-site info. We have the towers and poles." (T. 3916).

The Supreme Court has stated that in order to determine that a particular error was harmless when that error involves a Constitutional violation, as it does here, the Court must be satisfied that there was no "reasonable possibility that the evidence complained of might have contributed to the conviction," Chapman v. California, 386 U.S. 18, 23 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85 (1963), and that the error was harmless beyond a reasonable doubt. Id. at 24. Here, the cell-site data – whose issuance was a clear violation of Herron's Fourth Amendment rights – was critical to the conviction. Therefore, this Court should rule that the District Court erred when it did not suppress it, and should vacate Herron's convictions, or, alternatively, the Court should vacate counts 17 to 20, which related directly to Zapata's killing, and counts 1 and 2, racketeering charges that include Zapata's killing.

THIS COURT SHOULD VACATE AND
DISMISS COUNTS 7, 10, 14, AND 19
BECAUSE        THE        CHARGES
UNDERLYING THE  VIOLATIONS ARE
NOT "CRIMES OF VIOLENCE."

Herron was convicted and sentenced on four firearms counts (counts 7,  10,

14,  and 19) that were committed in relation to underlying "crimes of violence," in

violation of 18 U.S.C. § 924(c).  For counts 7, 14, and 19, the underlying crimes

were murder in-aid-of racketeering and drug-related murder in connection with the

death of Brooks, Russo, and Zapata, and for count 10, the underlying crime was

Hobbs Act robbery.  Because these underlying crimes did not constitute "crimes of

violence," as defined in 18 U.S.C. § 924(c), these convictions must be vacated and

dismissed.

An offense qualifies as a "crime of violence" if it satisfies one of two prongs

specified in 18 U.S.C. § 924(c)(3):  (a) it must have as an element the use of

physical force [the "force clause," specified in § 924(c)(3)(A)], or (b) it must

involve a substantial risk that physical force may be used [the "residual clause,"

specified in  § 924(c)(3)(B)].  These convictions should be vacated because the

residual clause must be deemed unconstitutionally vague in light of the Supreme

Court's decision in <u>Johnson</u> v. <u>United States</u>, __ U.S. __, 135 S.Ct. 2551 (2015),

and because the statutory definitions that apply to the underlying crimes  do not satisfy the force clause.

I.        The "residual clause" of § 924(c)(3)(B) is unconstitutionally vague.

In Johnson  v. United States, __ U.S. __, 135 S.Ct. 2551 (2015), the Supreme Court held that the Armed Career Criminal Act's ("ACCA") "residual clause" offends due process principles because it is unconstitutionally vague. While the clause analyzed in Johnson is not exactly the same as that of § 924(c)(3)(B), they are substantially similar, parallel statutes.  Most importantly, the residual clause at issue here contains all of the defects that compelled the Court to determine that the ACCA's residual clause was void for vagueness.

Section 924(c)(3)(B) defines a "crime of violence" as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The ACCA's defective language is found in its' corresponding definition of a "violent felony": in pertinent part, an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924e(2)(B)(ii). Both clauses require the trial courts to assess the potential risk that a particular criminal behavior might occur with reference to the statute that defines that behavior.   Under the ACCA, the court determines whether there is "serious" risk

of physical injury; under §924(c)(3)(B), the court determines if there is "substantial" risk of physical force.

Johnson held the ACCA's residual clause led the lower courts to a faulty process for categorizing prior felonies. In determining whether a particular statute qualifies as a violent felony, the ACCA requires that the trial courts use the "categorical approach," in which the court examines only the statutory elements of the offense - not the particular facts relating to the petitioner's crime – to determine if the offense qualifies as a "violent felony." Furthermore, the court must "picture the kind of conduct that the crime involves in 'the ordinary case' and judge whether that abstraction presents a serious risk of potential injury." Johnson, 135 S. Ct. at 2557. The Supreme Court reasoned that such a procedure, which lacks a clear test and sufficient guidance, ultimately devolves into guesswork, which "denies fair notice to defendants and invites arbitrary enforcement by judges." Id. at 2557. Thus the ACCA's residual clause was held to be overbroad and unconstitutionally vague.

Similarly, the residual clause at issue here requires use of the "categorical approach," Descamps v. United States, 133 S. Ct. 2276, 2283, to determine if the offense qualifies as a "crime of violence." And even more importantly, courts analyzing the language of the § 924(c) residual clause must engage in the same "ordinary case" analysis that Johnson found defective. See. e.g., United States v.

_Avila_, 770 F.3d 1100, 1107 (4th Cir. 2014), citing _James_ v. _United States_, 550 U.S. 192, 208. ("It is sufficient [to find a crime of violence] if 'the conduct encompassed by the elements of the offense in the ordinary case presents a serious risk of injury to another' " (emphasis added)). Since this analytical step was the fundamental flaw that rendered the ACCA unconstitutional in _Johnson_, the residual clause of § 924(c) is similarly unconstitutionally void.

Three Federal Circuits, after considering the 18 U.S.C. § 924(c)(3)(B) language in light of _Johnson_, have concluded that it is void for vagueness. In _Dimaya_ v. _Lynch_, 803 F.3d 1110 (9th Cir. 2015), the Ninth Circuit invalidated 18 U.S.C. § 16(b), which defines a "crime of violence," in the identical terms used in § 924(c)(3)(B), as unconstitutionally vague.[9] That Circuit adopted the reasoning used in _Johnson_, noting that, just as the ACCA's residual clause resulted in "grave uncertainty" when a court is "deciding what kind of conduct the 'ordinary case' of a crime involves" and "uncertainty about how much risk it takes for a crime to qualify as a violent felony," _Johnson_, 135 S.Ct. at 2558, § 16(b) is subject to identical unpredictability and arbitrariness. Similarly, in _United States_ v. _Vivas-Ceja_, ___ F.3d ___, 2015 WL 9301373 (7th Cir. 2015) and in _United States_ v. _Gonzalez- Longeria_, 2016 WL 537612 (5th Cir. 2016), the Seventh and Fifth

---

[9]  Pursuant to 18 U.S.C. § 16 (b), the term "crime of violence" means . . . any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Circuits recently ruled that the residual clause of 18 U.S.C. § 16(b) is void for vagueness in <u>Johnson's</u> aftermath.

Quite simply, there is no reasonable way to distinguish the flawed residual clause of the ACCA, which gives rise to an arbitrary, and overly- intuitive analysis of risk, from that of the residual clause of § 924(c).  The holding in <u>Johnson</u> did not depend on the type or quantity of the risk – which are minor distinctions between the two residual clauses – but on how the court assesses risk, a process that lacks rational criteria.  Neither clause can withstand constitutional scrutiny under due process principles.  Thus the residual clause stated in 18 U.S.C. § 924(c)(3)(B) is void for vagueness.

II.    <u>The charges that underlie counts 7, 10, 14,  and 19 (murder in-aid-of racketeering, drug-related murder, and Hobbs Act  robbery)  do not satisfy the force clause.</u>

The "force clause" states that a crime of violence is a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).  In determining whether the offense of intentional murder, as defined in New York State Penal Law § 125.25 (1), and Hobbs Act robbery, as defined in 18 U.S.C. §1951(b)(1)  constitute "crimes of violence" under this clause, this Court must examine the statutory definition of the criminal behavior, rather than considering how the petitioner may have committed the offense on a particular occasion, which is the "categorical

approach." <u>Descamps</u> v. <u>United States</u>, 133 S.Ct. 2276, 2283 (2013); <u>United States</u> v. <u>Acosta</u>, 470 F.3d 132, 135 (2d Cir. 2006). In addition, an offense qualifies as a "crime of violence" only if all of the criminal conduct encompassed by the statute matches or is narrower than the definition of "crime of violence." <u>United States</u> v. <u>Torres-Miguel</u>, 701 F.3d 165, 167 (4th Cir. 2012). Furthermore, the term "physical force" here means "violent force" that is "capable of causing physical pain or injury to another person." <u>Johnson</u> v. <u>United States</u>, 559 U.S. 133, 140 (2010) (construing the language of 18 U.S.C. § 924(e)(i), which is identical to the language considered here). Under that approach, the question for this Court is whether it is possible to commit the crimes that underlie these counts without using violent physical force.

The crime of intentional murder under New York Penal Law § 125.25(1) does not constitute a "crime of violence" because such a killing can be committed without the use, attempted use, or threatened use of violent physical force, as required by the force clause. New York Penal Law § 125.25(1) states:

> A person is guilty of murder in the second degree when:
>
> With intent to cause the death of another person, he causes the death of such person or of a third person . . .

There are many ways to intentionally cause death without employing violent physical force, such as poisoning, starving, withholding necessary care, or

exposing a person to hazardous materials. Thus, the full range of conduct subsumed under the murder statute includes criminal behavior that does not require "physical force"; as this Circuit stated in Chrzanoski v. Ashcroft, 327 F.3d 188, 195 (2d Cir. 2003), "human experience suggests numerous examples of intentionally causing physical injury without the use of force. " It is irrelevant to this analysis that the majority of prosecutions for murder probably do, in fact, involve the use of violent physical force. The possibility that an individual could be prosecuted under the statute without engaging in physical force requires, under the categorical approach, that it not qualify as a "crime of violence" under the force clause. Thus, since both murder in-aid-of racketeering and drug-related murder are intentional killings that do not necessarily include the use of force, they are not "crimes of violence" under the force clause.

Neither does Hobbs Act robbery, charged in count 10, satisfy the force clause. Pursuant to 18 U.S.C. § 1951(b)(1) (Hobbs Act robbery), the term "robbery" means:

> . . . the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining . . .

Clearly, there are actions that could constitute Hobbs Act robbery which lack the "use, attempted use, or threatened use of physical force," thus failing to qualify as "crimes of violence." An unlawful taking that is accomplished through the threat of injury may constitute such a robbery even though violent physical force is not involved. For example, a larceny that is precipitated by the threat to poison or starve another person could constitute a Hobbs Act robbery because it includes the fear of future injury, yet it does not constitute an "act of violence" under § 924(c)(A) because the element of violent force is lacking. Or the act of threatening to withhold care from a dependent, debilitated person, and using that threat to steal property, could constitute Hobbs Act robbery; it does not, however, constitute a "crime of violence."

The applicable standard of review here is that of plain error. See United States v. Gamez, 577 F.3d 394, 397 (2d Cir. 2009) (per curiam). Herron did not argue in the lower court that these counts could not constitute "crimes of violence." At his sentencing on July 28, 2014, the residual clause was still intact; Johnson was decided on June 26, 2015. A "decision of the trial court that was perfectly proper when issued" – for example, deeming Herron's convictions under these counts "crime of violence" – "may nonetheless be considered 'plainly erroneous' on appeal due to a supervening change in the law." United States v. Vilar, 729 F.3d 62, 71 (2d Cir. 2013).

For the foregoing reasons, Herron's convictions should be vacated and the indictment dismissed. Alternatively, Herron's convictions under counts 7, 10, 14, and 19 should be vacated, and the matter remanded for re-sentencing.

CONCLUSION

For the reasons stated in Points I, II, and III, this Court should vacate Herron's convictions and remand the case to the District Court, and for the reasons stated in Point IV, the case should be remanded to the District Court for resentencing.

Respectfully submitted,

s/_____
KELLEY SHARKEY

KELLEY SHARKEY, ESQ.
Attorney for Defendant-Appellant
        Ronald Herron
26 Court Street - Suite 2805
Brooklyn, New York 11242
(718)858-8843

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 17,040 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Respectfully submitted,

s/_____
KELLEY SHARKEY

KELLEY SHARKEY, ESQ.
Attorney for Defendant-Appellant
     Ronald Herron
26 Court Street - Suite 2805
Brooklyn, New York 11242
(718)858-8843

**SPECIAL APPENDIX**

# **Table of Contents**

**Page**

Judgment of the United States District Court,
   Eastern District of New York,
      entered April 2, 2015 ..................................................................... SPA1

# SPA1

AO 245B    (Rev. 6/30/2011- NYED) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| EASTERN | District of | NEW YORK |
|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |

| | Case Number: | CR 10-615 (S-6) (NGG) |
|---|---|---|
| RONALD HERRON | USM Number: | 78527-053 |

Kelley J. Sharkey, Esq.
Defendant's Attorney

## THE DEFENDANT:

**X**   **On June 26, 2014, was** found guilty by jury verdict on Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,
18, 19, 20 & 21 of the Superseding Indictment (S-6).

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| | SEE PAGE 2 FOR COUNTS OF CONVICTION | | |

The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X Any underlying Indictment is dismissed on the motion    of the United States.

☐ The defendant was not named in Counts of the Superseding Indictment.

☐ Count(s) _____ ☐ is   ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 2, 2015
Date of Imposition of Judgment


Signature of Judge


NICHOLAS  G. GARAUFIS, U.S.D.J.
Name and Title of Judge

April 8, 2015
Date

# SPA2

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
        Sheet 1A

| | | Judgment—Page | 2 | of | 8 |

DEFENDANT:      RONALD HERRON
CASE NUMBER:    CR 10-615 (S-6) (NGG)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1962 (c) and 1963 (a) | RACKETEERING | | 1 (S-6) |
| 18 U.S.C. §§ 1962 (d) and 1963 (a) | RACKETEERING CONSPIRACY | | 2 (S-6) |
| 21 U.S.C. §§ 846 and 841 (b)(1)(A)(iii) | CONSPIRACY TO DISTRIBUTE AT LEAST 280 GRAMS OF COCAINE BASE | | 3 (S-6) |
| 18 U.S.C. § 924 (c)(1) (A)(i) | UNLAWFUL USE AND POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME | | 4 (S-6) |
| 18 U.S.C. § 1959 (a)(1) | MURDER IN-AID-OF RACKETEERING | | 5, 12 & 17 (S-6) |
| 21 U.S.C.§ 848(e)(1)(A) | DRUG-RELATED MURDER | | 6, 13 & 18 (S-6) |
| 18 U.S.C. §§ 924 (c)(1) (A)(iii) and (c)(1)(C)(i) | UNLAWFUL USE AND DISCHARGE OF A FIREARM IN FURTHERANCE OF A CRIME OF VIOLENCE | | 7, 14 & 19 (S-6) |
| 18 U.S.C. § 924 (j)(1) | FIREARM-RELATED MURDER | | 8, 15 & 20 (S-6) |
| 18. U.S.C. §1951 (a) | ROBBERY OF NARCOTICS AND NARCOTICS PROCEEDS | | 9 (S-6) |
| 18 U.S.C. §§ 924 (c)(1) (A)(ii) and (c)(1)(C)(i) | UNLAWFUL USE AND BRANDISHING OF A FIREARM IN FURTHERANCE OF A CRIME OF VIOLENCE | | 10 (S-6) |
| 21 U.S.C. §§ 846, 841 (a)(1) and (b)(1)(C) | CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE HEROIN | | 11 (S-6) |
| 18 U.S.C. § 1959 (a)(5) | CONSPIRACY TO COMMIT MURDER IN-AID-OF RACKETEERING | | 16 (S-6) |
| 18 U.S.C. § 922 (g)(1) and 924 (a)(2) | FELON IN POSSESSION OF A FIREARM | | 21 (S-6) |

# SPA3

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page __3__ of __8__

DEFENDANT:        RONALD HERRON
CASE NUMBER:      CR 10-615 (S-6) (NGG)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

### SEE PAGE 4 FOR TERMS OF IMPRISONMENT

☐    The court makes the following recommendations to the Bureau of Prisons:

X    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____ ☐ a.m. ☐ p.m.    on _____ .

    ☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2 p.m. on _____ .

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# SPA4

AO 245B      (Rev. 09/11) Judgment in a Criminal Case
            Sheet 2A — Imprisonment

Judgment—Page ___4___ of ___8___

DEFENDANT:      RONALD HERRON
CASE NUMBER:   CR 10-615 (S-6) (NGG)

## ADDITIONAL IMPRISONMENT TERMS

| | |
|---|---|
| Count One (1) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 2, 3, 5, 6, 8, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Two (2) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 1, 3, 5, 6, 8, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Three (3) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 1, 2, 5, 6, 8, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Four (4) of the Superseding Indictment (S-6): | Five (5) years, to run consecutively to all other Counts. |
| Count Five (5) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 1, 2, 3, 6, 8, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Six (6) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 1, 2, 3, 5, 8, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Seven (7) of the Superseding Indictment (S-6): | Twenty-five (25) years, to run consecutively to all other Counts. |
| Count Eight (8) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 1, 2, 3, 5, 6, 9, 11, and 21; and to run consecutively to all other Counts. |
| Count Nine (9) of the Superseding Indictment (S-6): | Twenty (20) years, to run concurrently to Counts 1, 2, 3, 5, 6, 8, 11, and 21; and to run consecutively to all other Counts. |
| Count Ten (10) of the Superseding Indictment (S-6): | Twenty-five (25) years, to run consecutively to all other Counts. |
| Count Eleven (11) of the Superseding Indictment (S-6): | Twenty (20) years, to run concurrently to Counts 1, 2, 3, 5, 6, 8, 9, and 21; and to run consecutively to all other Counts. |
| Count Twelve (12) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 13 and 15; and to run consecutively to all other Counts. |
| Count Thirteen (13) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 12 and 15; and to run consecutively to all other Counts. |
| Count Fourteen (14) of the Superseding Indictment (S-6): | Twenty-five (25) years, to run consecutively to all other Counts. |
| Count Fifteen (15) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 12 and 13; and to run consecutively to all other Counts. |
| Count Sixteen (16) of the Superseding Indictment (S-6): | Ten (10) years, to run concurrently to Counts 17, 18, and 20; and to run consecutively to all other Counts. |
| Count Seventeen (17) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 16, 18, and 20; and to run consecutively to all other Counts. |
| Count Eighteen (18) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 16, 17, and 20; and to run consecutively to all other Counts. |
| Count Nineteen (19) of the Superseding Indictment (S-6): | Twenty-five (25) years, to run consecutively to all other Counts. |
| Count Twenty (20) of the Superseding Indictment (S-6): | Life, to run concurrently to Counts 16, 17, and 18; and to run consecutively to all other Counts. |
| Count Twenty-One (21) of the Superseding Indictment (S-6): | Ten (10) years, to run concurrently to Counts 1, 2, 3, 5, 6, 8, 9, and 11; and to run consecutively to all other Counts. |

All of the above CAG.

AO 245B    (Rev. 6/30/2011-NYED) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | |
|---|---|
| DEFENDANT:    RONALD HERRON | Judgment—Page   5   of   8 |
| CASE NUMBER:   CR 10-615 (S-6) (NGG) | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a    term of: **FIVE (5) ¥EARS ON COUNT THREE (3) OF THE SUPERSEDING INDICTMENT (S-6). THREE (3) YEARS ON COUNT ELEVEN (11) OF THE SUPERSEDING INDICTMENT (S-6) WHICH SHALL RUN CONCURRENTLY WITH COUNT THREE.**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☐   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within forty-eight hours after such change;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

# SPA6

AO 245B   (Rev. 6/30/2011-NYED) Judgment in a Criminal Case
Sheet 3C — Supervised Release

DEFENDANT:       RONALD HERRON
CASE NUMBER:     CR 10-615 (S-6) (NGG)

Judgment—Page ___6___ of ___8___

## SPECIAL CONDITIONS OF SUPERVISION

1.  THE DEFENDANT SHALL NOT POSSESS A FIREARM, AMMUNITION OR DESTRUCTIVE DEVICE.

AO 245B   (Rev. 6/30/2011-NYED) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    7    of    8

DEFENDANT:              RONALD HERRON
CASE NUMBER:            CR 10-615 (S-6) (NGG)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|------------|------|-------------|
| **TOTALS** | $ 2,100.00 | $ N/A | $ 26,000.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|-------------|--------------------|----------------------|
| The family of the victim Victor Zapata Payable to the: Clerk of Court, 225 Cadman Plaza East, Brooklyn, NY 11201 | | $26,000.00 | |

| **TOTALS** | $ _____ 0 | , ___ $26,000.00 ___ |
|------------|-------------|--------------------|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☑ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

  ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 6/30/2011-NYED) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:      RONALD HERRON
CASE NUMBER:    CR 10-615 (S-6) (NGG)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   X   **special assessment of $   2,100.00   due immediately, balance due**

    ☐   not later than _____ , or
    ☐   in accordance      ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ☐   Payment to begin immediately (may be combined with      ☐ C,      ☐ D, or      ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   X   Restitution   Schedule:

    **An Order of Restitution in the amount of $26,000.00, due immediately and payable at a rate of $25 per quarter while in
custody.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.